275 Neb. 702
LEXINGTON INSURANCE COMPANY ET AL., APPELLANTS,
v.
ENTREX COMMUNICATION SERVICES, INC. ET AL., APPELLEES.
No. S-06-1452.
Supreme Court of Nebraska.
Filed May 16, 2008.
J. Joseph McQuillan, of Walentine, O'Toole, McQuillan & Gordon, and Jeffrey R. Learned, Charles R. Tuffley, and Alyssa J. Endelman, of Grotefeld & Denenberg, L.L.C., for appellants.
William R. Johnson and Craig F. Martin, of Lamson, Dugan & Murray, L.L.P., and Raymond E. Walden for appellee Entrex Communication Services, Inc.
Thomas A. Grennan and Francie C. Riedmann, of Gross & Welch, P.C., L.L.O., for appellee Communication Structures & Services, Inc.
Dean Suing, of Katskee, Henatch & Suing, for appellee Dudutis Erection & Maintenance, Inc.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
Hearst-Argyle Properties, Inc., and the Hearst Corporation (collectively Hearst) owned a television broadcast tower in Omaha, Nebraska. In February 2003, Hearst contracted with Entrex Communication Services, Inc. (Entrex), to upgrade the antenna on the tower. After the tower collapsed in July 2003, Hearst sued Entrex. Hearst alleged that Entrex's gross negligence caused the collapse. Entrex moved for summary judgment. Entrex claimed that a waiver of subrogation in the parties' agreement barred Hearst's claims to the extent insurance proceeds covered the damages. The district court granted the motion and dismissed Hearst's claims for damages that had been compensated by insurance. Hearst's insurer appeals.
This appeal presents two issues. The first is whether enforcing a waiver of subrogation provision to bar a gross negligence claim violates public policy. The second is whether the waiver of subrogation is limited to damages to "the Work" (as defined in the agreement), or whether it also applies to damages to "non-Work" property. We conclude that the waiver of subrogation is effective against claims for gross negligence. We further conclude that the waiver applies to damages to both the Work and the non-Work property. We affirm.

I. BACKGROUND

1. FACTUAL BACKGROUND
The facts are not in dispute. Hearst owns and operates a television station in Omaha. In February 2003, Hearst contracted with Entrex to modify a 1,234-foot television broadcast tower by removing the analog antenna and replacing it with a digital antenna. Entrex subcontracted with Communication Structures & Services, Inc., which hired Dudutis Erection & Maintenance, Inc., to assist (hereinafter collectively Entrex).
The parties' contract required Hearst to obtain property insurance to cover "the Project" (as defined in the agreement). Instead of obtaining a specific property insurance policy to cover the Project, Hearst relied upon existing "all-risk" property insurance policies. These policies were issued by Lexington Insurance Company; Allied World Assurance Company, Ltd.; CNA Insurance Company; Everest Reinsurance (Bermuda) Limited; and Firemen's Fund Insurance Company (collectively Lexington). These all-risk policies collectively provided Hearst with $25 million in coverage.
The tower collapsed in July 2003, allegedly causing over $6 million in damages to the antenna, tower, transmission building, and personal property in the transmission building. Lexington compensated Hearst for its losses, less a $250,000 deductible. Hearst sued Entrex, alleging that the tower collapse occurred because of Entrex's gross negligence.
Entrex moved for partial summary judgment. It argued that a waiver of subrogation clause in the parties' agreement barred Hearst's claims against Entrex to the extent insurance proceeds were available to cover the damages. Hearst responded with two arguments: (1) The waiver of subrogation was unenforceable because Hearst had alleged gross negligence and enforcing a waiver of subrogation against a claim for gross negligence would violate public policy and (2) the waiver barred only claims for damage to the Work (as defined in the agreement), and thus, Entrex's motion should be denied as to damage claims involving non-Work property.
Regarding Hearst's first argument, the court concluded that enforcing a waiver of subrogation to bar a claim for gross negligence did not violate public policy. In deciding the second argument, the court concluded that Hearst had waived all claims covered by its all-risk insurance policies, including damages to the Work and non-Work property. The district court granted Entrex's motion and dismissed Hearst's claims for damages covered by insurance.
Hearst appealed, but the Nebraska Court of Appeals dismissed the appeal for lack of jurisdiction. It determined that although the court's order disposed of all subrogation claims by Lexington, Hearst's claims for uninsured losses remained pending. Thereafter, Lexington was substituted as the named plaintiff in this lawsuit and Hearst's claims were dismissed without prejudice and refiled under a different case number. The court then entered a final order (consistent with its earlier order), granting Entrex's motion for summary judgment on Lexington's claims. Lexington appeals.

2. RELEVANT CONTRACT PROVISIONS
The contract between Hearst and Entrex was an American Institute of Architects (AIA) standard form of agreement, document A101-1997. The agreement incorporated another AIA standard form of general conditions of the contract for construction, document A201-1997.
Pivotal to our analysis are two words used in the parties' agreement"Work" and "Project." Subparagraph 1.1.3 of the agreement defined "Work" as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations." Simply put, the Work is the construction and services to be provided by the contractor to fulfill the contractor's obligations under the contract. Subparagraph 1.1.3 also explains that the Work may constitute the whole or a part of the "Project."
Subparagraph 1.1.4 of the agreement defines the "Project" as "the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors." Stated more simply, the Project incorporates all the construction to be done, whether it be by the contractor, the owner, or other contractors. Here, the only construction being done was that by Entrex, so the terms "Work" and "Project" are interchangeable.

(a) Entrex's Obligations Under the Agreement
Article 11 of the agreement allocated insurance responsibilities among the parties. Subparagraph 11.1.1 of that article required Entrex, as the contractor, to obtain liability insurance covering claims for damages to non-Work property:
The Contractor shall purchase . . . and maintain . . . such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable . . . .
. . . .
.5 claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom[.]
(Emphasis supplied.)
(b) Hearst's Obligations Under the Agreement
Subparagraph 11.4.1 of the agreement required Hearst to obtain property insurance covering the Project:
Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. . . . This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.
(Emphasis supplied.)

(c) Waiver of Subrogation
The agreement's critical provision is set out in subparagraph 11.4.7. It contains a waiver of subrogation, which forms the basis of this appeal, and states in relevant part:
The Owner and Contractor waive all rights against . . . each other and any of their subcontractors . . . for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Paragraph 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary.

II. ASSIGNMENTS OF ERROR
Lexington assigns, restated, that the district court erred in holding that (1) the contractual waiver of subrogation barred gross negligence claims and (2) the waiver barred claims for damage to non-Work property.

III. STANDARD OF REVIEW
[1,2] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[2]
[3-5] The meaning of a contract is a question of law.[3] The determination of whether a contract violates public policy is a question of law.[4] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusions reached by the trial courts.[5]

IV. ANALYSIS

1. ENFORCING THE WAIVER OF SUBROGATION TO BAR LEXINGTON'S GROSS NEGLIGENCE CLAIMS DOES NOT VIOLATE PUBLIC POLICY
Lexington contends that the district court erred in deciding that the waiver of subrogation in subparagraph 11.4.7 bars Lexington's gross negligence claims. According to Lexington, public policy precludes parties from contractually disclaiming or limiting their liability for gross negligence.
Other jurisdictions are split on whether to enforce contractual waivers of subrogation against claims for gross negligence. Some courts have held that even though traditional exculpatory provisions may not be effective against claims for gross negligence, waivers of subrogation are effective to bar gross negligence claims.[6] But other courts have decided that because a traditional exculpatory clause is generally ineffective against a gross negligence claim, a waiver of subrogation will similarly be ineffective.[7]
Two leading cases in which courts have enforced waivers of subrogation to bar gross negligence claims are St Paul Fire and Marine v. Universal Builders[8] and Reliance Nat. Indem. v. Knowles Ind. Ser.[9] The St Paul Fire and Marine and Reliance Nat. Indem. courts reasoned, in part, that policy considerations associated with traditional exculpatory provisions are not implicated with waivers of subrogation:
The rule [that gross negligence generally renders exculpatory provisions void] exists . . . to ensure that "a party injured by another's gross negligence will be able to recover its losses." . . . In cases involving waivers of subrogation, however, there is no risk that an injured party will be left uncompensated, and it is irrelevant to the injured party whether it is compensated by the grossly negligent party or an insurer.[10]
In sum, because a waiver of subrogation clause does not leave a party uncompensated, these courts hold that the clause is effective even when the plaintiff alleges gross negligence.
Lexington argues we should give these cases little deference. It claims the decisions "erroneously focused on whether the injured party was compensated for damages . . . rather than on holding the grossly negligent defendant financially responsible for its misconduct."[11] Lexington relies on our decision in New Light Co. v. Wells Fargo Alarm Servs.[12] In New Light Co., a fire in the plaintiff's restaurant caused extensive damage to the building and its contents. The plaintiff alleged that the defendant was grossly negligent in designing, installing, and maintaining a fire alarm system in the building. The plaintiff further argued that public policy prevented the defendant from relying on a contractual exculpatory clause or limitation-of-damages provision to insulate itself from liability for its gross negligence. In New Light Co., we held that allowing the defendant to use a contractual agreement to insulate itself from damages caused by its own gross negligence would violate public policy.
Relying on New Light Co., Lexington argues that the reason exculpatory clauses may be unenforceable against gross negligence claims is not to ensure compensation for the injured party, but, rather, to hold grossly negligent parties financially responsible for their conduct. Lexington contends that Nebraska public policy requires that grossly negligent parties be held financially responsible for their conduct because otherwise they "would have no incentive to act more appropriately in the future."[13] Lexington acknowledges that New Light Co. addressed a contractual exculpatory clause and a limitation-of-damages provision, rather than a waiver of subrogation clause. But Lexington claims that allowing a party to use a waiver of subrogation to avoid gross negligence liability would similarly eliminate the financial incentive for that party to "`clean up its act."[14] Therefore, Lexington argues that the New Light Co. rationale and the underlying Nebraska public policy apply to contractual waivers of subrogation just as they did to the exculpatory clause and limitation-of-damages provision in that case.
Admittedly, language in New Light Co. can be read as suggesting that our policy concern was protecting the public by providing incentive for parties to refrain from grossly negligent conduct. We decline, however, to extend our discussion in New Light Co. to this case involving a contractual waiver of subrogation. We recognize that a waiver of subrogation shares similarities with traditional exculpatory clauses or limitation-of-damages provisions. But, we also find that significant differences exist between waivers of subrogation and the exculpatory clause and limitation-of-damages provision we dealt with in New Light Co.
First, as the Reliance Nat. Indem. and St Paul Fire and Marine courts observed, the danger with exculpatory clauses is that a party injured by another's gross negligence will be unable to recover its losses. But such danger is not present in cases involving waivers of subrogation because the waiver only applies to losses covered by insurance, so "there is no risk that an injured party will be left uncompensated."[15]
Also, waivers of subrogation serve other important policy goals not met by exculpatory clauses. As the Reliance Nat. Indem. court explained, "`waivers of subrogation are encouraged by the law and serve important social goals: encouraging parties to anticipate risks and to procure insurance covering those risks, thereby avoiding future litigation, and facilitating and preserving economic relations and activity.'"[16] Other courts have observed that a waiver of subrogation is particularly useful in a construction contract: "`Mt avoids disruption and disputes among the parties to the project. It thus eliminates the need for lawsuits, and yet protects the contracting parties from loss by bringing all property damage under the all risks builder's property insurance.'"[17] Traditional exculpatory clauses and limitation-of-damages provisions do not serve this same important policy goal. Because of these differences, we decline to extend New Light Co. to the present case.
[6] We, like other jurisdictions, recognize the important policy goal that waivers of subrogation serve in avoiding disruption of construction projects and reducing litigation among parties to complicated construction contracts. Concluding that waivers of subrogation cannot be enforced against gross negligence claims would undermine this underlying policy by encouraging costly litigation to contest whether a party's conduct was grossly negligent. Therefore, we conclude that "public policy favors enforcement of waivers of subrogation even in the face of gross negligence [claims]."[18]
Because the waiver of subrogation clause in subparagraph 11.4.7 is effective to bar Lexington's gross negligence claims, we next determine the scope of the waiver.

2. THE WAIVER OF SUBROGATION APPLIES TO INSURED DAMAGES, WHICH HERE INCLUDE BOTH THE WORK AND THE NON-WORK PROPERTY
Lexington next contends that the district court erred in holding that the waiver of subrogation in subparagraph 11.4.7 barred Lexington's claims for damage to non-Work property. Again, the parties' agreement essentially defines "Work" as the construction and services provided by the contractor to fulfill the contractor's obligations under the contract. The record reflects that of the over $6.2 million in claimed damages, about only $470,000 represented damages to the Work, while the remainder represented damages to non-Work property. We understand from Lexington's counsel at oral argument that the antenna was the Work property, while the tower and transmission building represented the non-Work property.
The waiver of subrogation in subparagraph 11.4.7 states in relevant part, "The Owner [Hearst] and Contractor [Entrex] waive all rights against . . . each other . . . for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Paragraph 11.4 or other property insurance applicable to the Work . . . ." Subparagraph 11.4.1 required Hearst to purchase a builder's risk "all-risk" property insurance policy "comprising total value for the entire Project at the site." Here, "Project" and "Work" are interchangeable. Hearst did not purchase a separate builder's risk policy covering the Work, but instead relied upon existing "all-risk" property insurance policies issued by Lexington and other companies. These all-risk policies collectively provided Hearst with $25 million in coverage for both the Work and the non-Work property. Lexington argues that the waiver of subrogation in subparagraph 11.4.7 applied only to damages to the Work. In other words, Lexington claims that even though Hearst's existing property insurance policies covered both the Work and the non-Work property, the parties waived subrogation only for damages to the Work property. Therefore, Lexington believes it can recover for claims it paid for damages to non-Work property.
Entrex, of course, contends that the waiver applies to all insured damages, including those to non-Work property. Lexington argues that even if Entrex's interpretation is reasonable, the waiver is at most ambiguous. Lexington also claims that Entrex "drafted" the contract by requiring use of the standard AIA form and that therefore, we should construe any ambiguity against Entrex.
[7-10] We have stated that a contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[19] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[20] Also, a contract must receive a reasonable construction, and we must construe it as a whole and, if possible, give effect to every part of the contract.[21] In construing a contract, we apply the general rule that when there is a question about the meaning of the contract's language, the contract will be construed against the party preparing it.[22]
We determine that the waiver of subrogation is subject to only one reasonable interpretationthat urged by Entrex. Therefore, as explained later, we conclude that the contract is not ambiguous and that here, the waiver applies to damages to both the Work and the non-Work property.

(a) Courts Addressing the Issue Generally

Apply One of Two Approaches
A review of cases from other jurisdictions reveals two approaches to when an insurer's subrogation rights are barred. In Trinity Universal Ins. Co. v. Bill Cox Const.,[23] the Texas Court of Appeals has summarized the two approaches:
[O]ne approach makes a distinction between Work (as that word is defined in the contract) and non-Work property and limits the scope of the waiver to damages to the Work; and the second approach draws no distinction between Work and non-Work, but instead, limits the scope of the waiver to the proceeds of the insurance provided under the contract between the owner and contractor.

(b) Lexington Urges the First Approach
Lexington urges us to adopt the first approach described above. Lexington contends that "a reasonable construction of the waiver is that it has no relevance to claims for damage to non-Work property."[24] The New York Court of Appeals applied this approach in S.S.D.W. Co. v. Brisk Co.[25] The waiver clause in that case was nearly identical to the waiver clause here. The court explained that the waiver barred subrogation claims to the extent the damages sought were covered by either "(1) `insurance obtained pursuant to [art 17] [here paragraph 11.4]' or (2) `any other property insurance applicable to the Work.'"[26] Article 17.3 of the parties' agreement required the owner to provide insurance "`upon the entire Work at the site.'"[27] In deciding the waiver barred only claims for damages to the Work, the S.S.D.W. Co. court reasoned:
It makes no difference whether the policy under which subrogation is sought is one which the owner purchased specifically to insure the Work pursuant to article 17.3 [here subparagraph 11.4.1] or some other policy covering the owner's property in which the owner has also provided coverage for the Work. In either event, the waiver clause, if given its plain meaning, bars subrogation only for those damages covered by insurance which the owner has provided to meet the requirement of protecting the contractor's limited interest in the buildingi.e., damages to the Work itself.[28]
Therefore, the S.S.D.W. Co. court concluded that to the extent the plaintiff sought recovery for damages to non-Work property, that claim was not barred by the waiver of subrogation. Other courts have similarly decided the waiver applies only to damages to the Work.[29]

(c) Entrex Urges the Second Approach
Entrex urges us to adopt the second approach described by the Trinity Universal Ins. Co. court. Entrex contends that we should follow those courts that have decided the waiver applies to all damages insured by the owner's property insurance policy, regardless of whether they represent damages to the Work or non-Work property. The courts adopting this approach represent the majority.[30]
The California Court of Appeal adopted this approach in Lloyd's Underwriters v. Craig and Rush.[31] Like Hearst, the owner in Lloyd's Underwriters elected not to purchase a separate "builder's risk" policy with coverage limited to the construction work. Instead, the owner chose to rely on its existing "all-risk" property insurance to satisfy its obligations under the contract to provide property insurance for the Work. Non-Work property was damaged while the contractor was repairing the roof of the owner's facility. The owner's insurers argued that these damages, although insured, fell outside the waiver of subrogation.
The Lloyd's Underwriters court read the waiver's language to mean that "so long as a policy of insurance `applicable to the Work' pays for the damage, the waiver applies."[32] The court observed that the owner's insurers "[did] not dispute that their policies (1) were `applicable to the Work' and (2) `covered' or paid for the loss."[33] The court reasoned that satisfaction of these two criteria allowed the court to conclude the waiver applied. Stated another way, the Lloyd's Underwriters court essentially concluded that if a policy covering the Work paid for the losses, the parties waived subrogation for those losses, regardless of whether they were damages to the Work or non-Work property.
Another case often cited for the majority approach is Haemonetics Corp. v. Brophy & Phillips Co.[34] There, the owner also relied on an existing property insurance policy to meet its obligation to provide property insurance covering the Work. During construction, a fire damaged non-Work property, and the owner received insurance proceeds to cover the damage. The owner later argued that the parties' contract required only that it maintain property insurance on the Work, so the waiver applied only to damages to the Work property. The court disagreed, reasoning:
The preexisting insurance policy . . . was the insurance the owner chose to provide to comply with § 11.3 [here subparagraph 11.4.1] even though that policy may have been more extensive than what was required. By the terms of [the waiver of subrogation provision], the waiver of rights extends to the proceeds of any insurance provided under § 11.3.[35]
The Haemonetics Corp. and Lloyd's Underwriters courts reached the same conclusion, but with different rationales. Again, for clarification, the waiver applies to the extent losses are covered by (1) insurance obtained to meet the owner's obligation to acquire property insurance covering the Project or (2) "other property insurance applicable to the Work." The Haemonetics Corp. court reasoned that the owner's preexisting policy fell within the first alternative as the policy the owner chose to provide to comply with the contract. In contrast, the Lloyd's Underwriters court reasoned that the owner's preexisting policy came within the second alternative as "other property insurance applicable to the Work." Despite their different classifications of the policies, both courts decided the owner's preexisting policy fell within the waiver of subrogation clause. The courts concluded that the scope of the waiver clause was not defined by the property damaged, but, rather, by the extent the damages were covered by those policies described in the clause: All losses covered by those policies were subject to the waiver, whether those losses related to the Work or non-Work property.

(d) We Adopt the Majority Approach and Conclude That the Waiver Applies to Damages to Both the Work and the Non-Work Property
We find the majority courts' rationale persuasive. We also believe this approach is more consistent with other provisions in the parties' agreement and furthers the purpose of the waiver clause. Furthermore, construing the contract as a whole, we are unable to conclude that the minority approach is reasonable.
The majority interpretation is consistent with a related provision, subparagraph 11.4.5 in the parties' agreement, which states in relevant part:
If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, . . . the Owner shall waive all rights in accordance with the terms of Subparagraph 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance.
We understand this provision to mean that if the owner acquires a separate property insurance policy to cover non-Project propertya policy that did not cover the Project or Work propertyand the non-Project property is damaged, the owner waives subrogation rights for the insurer as to those damages. So even though the damage occurred to non-Work property, the owner waived subrogation rights because the damages were insured. This provision shows that the contracting parties were not opposed to waiving damages to non-Work property.[36]
Subparagraph 11.4.5 reinforces our conclusion that the waiver in subparagraph 11.4.7 applies to all damagesincluding Work and non-Work damagescovered by the owner's property insurance policy. An example is helpful. Suppose the owner purchased two separate property insurance policies: "Policy A" that covered only the Project (Work) and "Policy B" that covered only the non-Work property. Under subparagraph 11.4.7, the owner waives subrogation rights as to any damages covered by Policy A (damages to the Work property). Under subparagraph 11.4.5, the owner waives subrogation rights as to any damages covered by the separate Policy B (damages to the non-Work property). So, applying subparagraphs 11.4.5 and 11.4.7, the owner waives damages to both the Work and the non-Work property when the owner obtains two separate policies. We see no reason why the parties would intend a different result when, instead of purchasing two separate policies, the owner relied on one policy covering both the Work and the non-Work property, as Hearst did here.
Also, as the Haemonetics Corp. court noted, the majority approach furthers the policy underlying the use of waiver of subrogation clauses in construction contracts. That court explained that a waiver of subrogation is useful in construction contracts because it avoids disrupting the project and eliminates the need for lawsuits.[37] The majority approach furthers this purpose. Applying the waiver to all losses covered by the owner's property insurance policy eliminates litigation over liability issues and whether the claimed loss was damage to the Work or non-Work property.[38]
Lexington, of course, argues we should not adopt the majority approach. Lexington contends this approach is inconsistent with the agreement's allocation of insurance responsibilities. Again, under subparagraph 11.1.1, Entrex was obligated to obtain liability insurance covering claims for damages to non-Work property, while subparagraph 11.4.1 required Hearst to obtain property insurance covering the Project (Work). The insurers in Lloyd's Underwriters made a similar argument. They argued that the court must interpret the waiver of subrogation as waiving claims only to the extent the loss fell within the owner's area of insurance responsibility (i.e., a loss to the Work). The court decided this contention ignored the language defining the scope of claims falling within the waiver clause. The court explained, "The waived claims are not defined by what property is harmed (i.e., `any injury to the Work')"[39] instead, the scope of waived claims is delimited by the source of any insurance proceeds paying for the loss (i.e., whether the loss was paid by a policy `applicable to the Work')."39 We agree. Further, as another court noted, the waiver clause expressly provides that the "`waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise." This reconciles any inconsistency between the waiver of subrogation and the agreement's allocation of insurance responsibilities.[40]
Having reviewed the reasons that support the majority approach, we conclude that the minority approach is not a reasonable interpretation of subparagraph 11.4.7. First, the minority approach is inconsistent with the waiver's purpose of avoiding disruption and disputes among the parties to the project by eliminating the need for litigation. Adopting the minority approach would actually encourage litigation about whether the claimed loss was damage to the Work or non-Work property. More important, we are unable to reconcile subparagraph 11.4.5 with the minority approach. If we applied the minority approach, we would be left with two disparate results depending on whether the owner (1) purchased a single policy covering both the Work and the non-Work or (2) purchased two separate policies. An owner relying on a single policy, as Hearst did here, would waive only damages to the Work (11.4.7). But an owner purchasing two separate policies, as in the example above, would waive damages to both the Work (11.4.7) and the non-Work (11.4.5). We do not believe the parties intended this disparity. Because we must construe the contract as a whole,[41] subparagraph 11.4.5 is a hurdle that prevents us from deciding that the minority approach is a reasonable interpretation of subparagraph 11.4.7. Because we decide that the minority approach is not a reasonable interpretation of subparagraph 11.4.7, we conclude that subparagraph 11.4.7 is not ambiguous. Instead, it is subject to only one reasonable interpretationthat of the majority courts. Therefore, we need not construe the contract against the drafter.
We find the majority courts' rationale persuasive. The Minnesota Supreme Court has summarized the result under this approach:
The owner has the option of purchasing an all-risk policy specifically to cover the "work" or can rely on any existing property insurance which would cover the "work." However, the waiver clause creates the "work" and "nonwork" distinction based upon the owner's decision to purchase a new policy or to rely upon an existing one. The owner agrees to waive the right to sue for damages done only to the "work" if it purchases a separate all-risk policy specifically to cover the "work." But if the owner relies on an existing policy which is so broad that it covers both "work" and "nonwork" property, it waives the right to sue for all damages done as long as that damage is covered by the policy.[42]
We hold that the waiver of subrogation applies to all damages covered by a property insurance policy "obtained pursuant to. . . Paragraph 11.4" or other property insurance policy that covers the Work. When that policy is broad enough to cover both the Work and the non-Work property, the waiver extends to non-Work damages.
Here, Hearst relied on existing policies covering both the Work and the non-Work property. Because these policies are "applicable to the Work," they fall within the purview of subparagraph 11.4.7. Applying the approach adopted today, Hearst waived subrogation rights on behalf of Lexington for any damages covered by those policies, including damages to non-Work property. Therefore, the district court did not err in granting summary judgment for Entrex and dismissing Lexington's claims for the insurance proceeds it paid.

V. CONCLUSION
We conclude that the district court correctly determined that contractual waivers of subrogation are effective to bar gross negligence claims. Therefore, the waiver of subrogation in the parties' agreement was enforceable even though Lexington alleged Entrex was grossly negligent. Also, we interpret the waiver of subrogation provision, subparagraph 11.4.7, as applying to all damages covered by a property insurance policy "obtained pursuant to . . . Paragraph 11.4" or other property insurance policy that covers the Work. When that policy is broad enough to cover both the Work and the non-Work property, as Hearst's policies were here, the waiver applies to both the Work and the non-Work damages. Thus, Lexington is unable to recover the proceeds it paid for damages to the Work and non-Work property. The district court did not err in granting Entrex's motion for summary judgment or in dismissing Lexington's claims for the insurance proceeds it paid.
AFFIRMED.
NOTES
[1] Erickson v. U-Haul Internat., 274 Neb. 236, 738 N.W.2d 453 (2007).
[2] Id.
[3] Hogelin v. City of Columbus, 274 Neb. 453, 741 N.W.2d 617 (2007).
[4] Spanish Oaks v. Hy-Vee, 265 Neb. 133, 655 N.W.2d 390 (2003).
[5] Eastlick v. Lueder Constr. Co., 274 Neb. 467, 741 N.W.2d 628 (2007).
[6] See, e.g., St Paul Fire and Marine v. Universal Builders, 317 F. Supp. 2d 336 (S.D.N.Y. 2004), affirmed as modified 409 F.3d 73 (2d Cir. 2005); Reliance Nat. Indem. v. Knowles Ind. Ser., 868 A.2d 220 (Me. 2005); Behr v. Hook, 173 Vt. 122, 787 A.2d 499 (2001).
[7] See, e.g., Butler Mfg. Co., Inc. v. Americold Corp., 841 F. Supp. 1107 (D. Kan. 1993); Colonial Properties Realty v. Lowder Const., 256 Ga. App. 106, 567 S.E.2d 389 (2002).
[8] St Paul Fire and Marine, supra note 6.
[9] Reliance Nat. Indem., supra note 6.
[10] Id. at 226 (citation omitted). See, also, St Paul Fire and Marine, supra note 6.
[11] Brief for appellants at 21-22.
[12] New Light Co. v. Wells Fargo Alarm Servs., 247 Neb. 57, 525 N.W.2d 25 (1994).
[13] Brief for appellants at 16.
[14] Id. at 18.
[15] Reliance Nat. Indetn., supra note 6, 868 A.2d at 226.
[16] Id. at 225-26.
[17] Haemonetics Corp. v. Brophy & Phillips Co., 23 Mass. App. 254, 258, 501 N.E.2d 524, 526 (1986), quoting Tokio Marine & Fire v. Employers Ins. of Wausau, 786 F.2d 101 (2d Cir. 1986). See, also, St Paul Fire and Marine, supra note 6; Reliance Nat. Indem., supra note 6; Behr, supra note 6.
[18] Reliance Nat. Indem., supra note 6, 868 A.2d at 227.
[19] Kluver v. Deaver, 271 Neb. 595, 714 N.W.2d 1 (2006).
[20] Id.
[21] See id.
[22] See Artex, Inc. v. Omaha Edible Oils, Inc., 231 Neb. 281, 436 N.W.2d 146 (1989).
[23] Trinity Universal Ins. Co. v. Bill Cox Const., 75 S.W.3d 6, 11 (Tex. App. 2001).
[24] Brief for appellants at 24.
[25] S.S.D.W. Co. v. Brisk Co., 76 N.Y.2d 228, 556 N.E.2d 1097, 557 N.Y.S.2d 290 (1990).
[26] Id. at 233, 556 N.E.2d at 1099, 557 N.Y.S.2d at 292 (emphasis in original).
[27] Id. at 233, 556 N.E.2d at 1099-1100, 557 N.Y.S.2d at 292-93 (emphasis in original).
[28] Id. at 233-34, 556 N.E.2d at 1100, 557 N.Y.S.2d at 293.
[29] See, e.g., Midwestern Indem. Co. v. Systems Builders, 801 N.E.2d 661 (Ind. App. 2004); Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15 (Mo. 1995); PEMCO v. Sellen Constr. Co., 48 Wash. App. 792, 740 P.2d 913 (1987).
[30] See, e.g., ASIC II Ltd. v. Stonhard, Inc., 63 F. Supp. 2d 85 (D. Me. 1999); Stop and Shop v. ABCO Refrigeration Supply, 48 Conn. Supp. 301, 842 A.2d 1194 (Conn. Super. 2003); Trinity Universal Ins. Co., supra note 23; Employers Mut. Cas. Co. v. A.C.C.T., Inc., 580 N.W.2d 490 (Minn. 1998); Lloyd's Underwriters v. Craig and Rush, 26 Cal. App. 4th 1194, 32 Cal. Rptr. 2d 144 (1994); Chadwick v. CSI, Ltd., 137 N.H. 515, 629 A.2d 820 (1993); Haemonetics Corp., supra note 17.
[31] Lloyd's Underwriters, supra note 30.
[32] Lloyd's Underwriters, supra note 30, 26 Cal. App. 4th at 1198, 32 Cal. Rptr. 2d at 146.
[33] Id.
[34] Haemonetics Corp., supra note 17.
[35] Haemonetics Corp., supra note 17, 23 Mass. App. at 257, 501 N.E.2d at 526.
[36] See, Lloyd's Underwriters, supra note 30; Walker Engineering v. Bracebridge Corp., 102 S.W.3d 837 (Tex. App. 2003).
[37] Haemonetics Corp., supra note 17, citing Tokio Marine & Fire, supra note 17.
[38] See, Stop and Shop, supra note 30; S.S.D. W. Co., supra note 25 (Alexander, J., dissenting); Haetnonetics Corp., supra note 17.
[39] Lloyd's Underwriters, supra note 30, 26 Cal. App. 4th at 1200, 32 Cal. Rptr. 2d at 148 (emphasis in original).
[40] See Chadwick, supra note 30, 137 N.H. at 524, 629 A.2d at 826.
[41] See Kluver, supra note 19.
[42] Employers Mut. Cas. Co., supra note 30, 580 N.W.2d at 493.