NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5395-16T4

ACE AMERICAN INSURANCE
COMPANY,

     Plaintiff-Appellant,

v.

AMERICAN MEDICAL
PLUMBING, INC.,

     Defendant-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **April 4, 2019**
>
> **APPELLATE DIVISION**

Argued September 26, 2018 – Decided April 4, 2019

Before Judges Koblitz, Ostrer and Currier.

On appeal from Superior Court of New Jersey, Law Division, Union County, Docket No. L-0299-17.

Daniel Q. Harrington argued the cause for appellant (Cozen O'Connor, PC, attorneys; Daniel Q. Harrington, on the briefs).

Fredric P. Gallin argued the cause for respondent (Methfessel & Werbel, PC, attorneys; Fredric P. Gallin, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal requires us to interpret the waiver-of-subrogation provisions of a widely used form construction contract – the American Institute of Architects (AIA) form A201 – 2007 General Conditions of the Contract for Construction (A201).[1] Contending the trial court misread the contract, plaintiff ACE American Insurance Company (ACE) appeals from summary judgment dismissing its subrogation action against defendant American Medical Plumbing, Inc. (American). We affirm, based on A201's plain language, its evident goal to transfer the risk of construction-related losses to insurers and preclude lawsuits among contracting parties, and persuasive out-of-state authority.

I.

For purposes of ACE's motion, the following facts are undisputed. ACE's insured, Equinox Development Corporation (Equinox Development), contracted in March 2012 with Grace Construction Management Company, LLC (Grace Construction), to build the "core and shell" of a new health club in

---

[1]  The AIA revises the A201 contract every ten years. <u>See</u> Am. Inst. of Architects, AIA Document Commentary to A201 – 2007 General Conditions of the Contract for Construction 1 (2007) (AIA Commentary to A201). For convenience, "A201" will refer to the 2007 version. We will include the year when referring to previous versions.

Summit.[2] American was a plumbing subcontractor. Sometime in April 2013, after the work under the contract was completed, a water main failed and flooded the health club.

When the flood occurred, ACE provided Equinox Holdings and its subsidiaries, including Equinox Development, with blanket all-risk insurance including multiple forms of coverage for its operations in the United States. The policy term was September 2012 to September 2013, with coverage of $32 million per occurrence. Among other coverages, the policy insured Equinox's interest in its real and personal property, including "[p]roperty while in the course of construction and/or during erection, assembly and/or installation." It also included any interests of contractors and sub-contractors for which Equinox would assume liability by contract. Regarding subrogation, the policy stated, "In the event of any payment under this policy, except where subrogation rights have been waived, the Insurer shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore." ACE had provided Equinox with similar coverage, with a limit of $30 million, the preceding annual period.

---

[2] Equinox Development is described as a subsidiary of Equinox Holdings, Inc. (Equinox Holdings). Where the record does not clearly distinguish between the two, we will simply use "Equinox."

A-5395-16T4

ACE paid Equinox almost $1.2 million for the net damages to its real and personal property. Less than $8,000 was for repairs to the "core and shell" construction covered by the A201 contract. The rest was apparently for damage to internal construction, furnishings and equipment.

ACE eventually filed suit against American, claiming it was at fault for the water-main break and seeking recovery of its payments to Equinox. American promptly answered, invoking A201's subrogation-waiver provisions. Soon thereafter, American filed its motion for summary judgment, which the trial court granted, relying mainly on an unpublished federal district court opinion.

II.

We review the trial court's order de novo, applying the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). The dispositive issue before us is one of contract interpretation. Absent an ambiguity arising from disputed facts, interpretation of A201, like of any contract, involves a question of law, which we review de novo. Kieffer v. Best Buy, 205 N.J. 213, 222-23 & n.5 (2011).

To fulfill our interpretative mission, we determine "the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and

practices, and the objects the parties were striving to achieve." George M. Brewster & Son, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 32 (1954); see also Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009) (stating that "[a] basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner"). In so doing, we strive to give effect to "all parts of the writing and every word of it," to the extent possible. Washington Constr. Co. v. Spinella, 8 N.J. 212, 217 (1951) (quoting 9 Williston on Contracts § 46, at 64 (rev. ed. 1936)). Our objective is to determine the parties' intent. Kieffer, 205 N.J. at 223. But "[i]t is not the real intent but the intent expressed or apparent in the writing that controls." Friedman v. Tappan Dev. Corp., 22 N.J. 523, 531 (1956).

## III.

We describe first A201's overall scheme. In broad terms, A201 requires the owner and contractor to procure, respectively, property and liability insurance; and requires the owner and contractor and its subcontractors (and sub-subcontractors, agents and employees) to waive all rights against each other for damages covered by the required property insurance policy. A201

also extends the subrogation waiver to certain other forms of insurance that the owner may procure at its own option for losses during and after construction.[3]

Specifically, the contract requires an owner to procure "builder's risk 'all-risk'" insurance for the benefit of itself and its contractors.[4] A201 § 11.3.1. The policy must cover not only the amount the owner owes for the "Work" – that is, the construction and services covered by the contract – but the value of the entire "Project," which may include construction by other contractors. Ibid. See also id. §§ 1.1.3, 1.1.4 (defining "Work" and "Project"). In this case, the Work – which consisted of the health club's "core and shell" – was evidently only a part of the total Project, which included furnishings and

---

[3] We note that the parties do not dispute the enforceability of a subrogation waiver in principle, which is well-settled. See George M. Brewster & Son, 17 N.J. at 28 (stating that "parties may by agreement waive or limit the right" of subrogation); see also Sch. Alliance Ins. Fund v. Fama Constr. Co., 353 N.J. Super. 131, 140 (Law Div. 2001), aff'd o.b., 353 N.J. Super. 1 (App. Div. 2002).

[4] See Bryan Constr. Co. v. Emp'rs Surplus Lines Ins. Co., 116 N.J. Super. 88, 97 (App. Div. 1971) (stating that a builder's risk policy "is ordinarily issued to a contractor or a property owner in order to insure him against loss occurring during the construction, repair or alteration of a building"), aff'd in part and rev'd in part, 60 N.J. 375 (1972); see generally 11 Couch on Insurance §§ 155:42 - :49 (3d ed. 2017) (describing builder's risk insurance). Section 11.3.1.1 of A201 states that the "all-risk" policy must insure "against the perils of fire . . . and physical loss or damage including . . . flood."

interiors, as well.[5] The insurance must cover the "interests of the Owner, the Contractor, Subcontractors, and Sub-subcontractors in the Project." A201 § 11.3.1. The owner's insurance obligation subsists as long as contractors are unpaid or have an insurable interest in the Project.[6] <u>Ibid.</u> As we discuss below, Equinox satisfied the mandate of section 11.3.1 through its pre-existing blanket all-risk policy from ACE, which included builder's risk coverage for all Equinox construction sites across the United States.

---

[5] ACE insists without citing competent evidence in the record that the Work and Project were "coextensive." However, it acknowledges that, in addition to the Work, Equinox hired other contractors for interior construction, or "fit-up."

[6] Section 11.3.1, under the heading, "PROPERTY INSURANCE," states:

> 11.3.1 Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract Modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained . . . until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.3 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

A-5395-16T4

A201 also requires an owner to purchase insurance for boilers and machinery during installation and until final acceptance. A201 § 11.3.2. At its option, the owner may purchase loss-of-use insurance. A201 § 11.3.3. The owner must also maintain its "usual liability insurance." A201 § 11.2.

A201 imposes an insurance requirement on the contractor, too. The contractor must obtain insurance to protect itself from claims arising out of its operations or those of its subcontractors, agents or employees. A201 § 11.1.1.5. The contractor's policy must cover "[c]laims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom." Ibid. The contractor's coverage must name the owner as an additional insured for claims arising out of the contractor's negligence. A201 § 11.1.4.

The waiver-of-subrogation clause bars recovery of damages from the owner, contractor, and subcontractors "to the extent" the damages are covered by two forms of property insurance. The first is property insurance an owner obtains "pursuant to" section 11.3, which includes the builder's risk insurance that section 11.3.1 references.[7] The second is any "other property insurance

_____

[7] The phrase "insurance obtained pursuant to this Section 11.3" plainly refers to insurance that section 11.3 requires the owner to obtain, including builder's risk, see § 11.3.1, and boiler and machinery insurance, see § 11.3.2. The parties do not present the issue whether the phrase also encompasses insurance

(continued)

applicable to the Work" that the contract does not require. Section 11.3.7 states:

> 11.3.7 WAIVERS OF SUBROGATION
>
> The Owner and Contractor waive all rights against . . . each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss <u>to the extent covered</u> by <u>property insurance obtained pursuant to this Section 11.3</u> or <u>other property insurance applicable to the Work</u>, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary.
>
> [(Emphasis added).]

The contractor must obtain similar waivers from its subcontractors. The insurance policy "shall provide such waivers of subrogation by endorsement or otherwise." <u>Ibid.</u> The "waiver of subrogation shall be effective as to a person or entity . . . whether or not the person or entity had an insurable interest in the property damaged." <u>Ibid.</u>

Section 11.3.5 extends the waiver of subrogation to damages that additional, optional insurance policies may cover. The waiver extension applies to two forms of insurance policies, which section 11.3.5 describes in

---

(continued)

that section 11.3 does not require but which it addresses – such as loss-of-use insurance, <u>see</u> § 11.3.3, and insurance described in section 11.3.5, which we discuss below.

terms of when they are procured, what they cover, and their relation to other policies. The first is an insurance policy procured "during the Project construction period," which covers real or personal property at or adjacent to the Project site, and is "separate" from the policy insuring the Project. A201 § 11.3.5. The second is an insurance policy provided "after final payment," which covers the completed Project, and is "other than" the policy that insured the project during construction. Ibid. Section 11.3.5 states:

> If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment, property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.3.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.
>
> [(Emphasis added).]

## IV.

We turn now to ACE's claim on appeal. At bottom, ACE argues that its claim against American is not the kind that A201 subjects to a subrogation waiver. ACE contends that the subrogation waiver under section 11.3.7 has a spatial limit, applying only to claims for damage to the Work itself but not

adjacent property, as well as a temporal limit, applying only to claims arising before construction is complete. Since the bulk of the water damage affected not the health club's "core and shell" but its internal construction and furnishings, and since the claim here arose after the Work was completed, ACE concludes that section 11.3.7 does not restrict it from suing American.

Regarding section 11.3.5, which expressly applies the subrogation waiver to certain post-completion insurance, ACE contends that its insurance policy was not "other than" a policy that insured the Project during construction.[8] Noting that the record does not disclose the exact date construction began and ended, ACE contends that its 2012-2013 policy simply extended its 2011-2012 policy and was thus not a policy "other than" the one

---

[8] We reject ACE's contention that American conceded this point in responding to ACE's statement of material facts. ACE asserted, "The property damage giving rise to this claim was not insured under a policy or policies 'separate from' or 'other than' that which insured the Project during the construction period within the meaning of Section 11.3.5." Recognizing that ACE's assertion was really a legal conclusion – contrary to Rule 4:46-2, which requires a statement of material facts – American responded, "[W]e disagree with the implied legal conclusion that the nature of Ace's insurance policy removes it from the waiver of subrogation." Furthermore, only undisputed factual assertions that are "sufficiently supported" are deemed admitted. Claypotch v. Heller, Inc., 360 N.J. Super. 472, 488 (App. Div. 2003) (quoting Rule 4:46-2(b)). The meaning of "a policy . . . other than those insuring the Project during the construction period" is a legal issue for the court.

that insured the construction project.[9]  Alternatively, ACE contends that even if its policy qualified as post-completion coverage governed by section 11.3.5, that section refers back to section 11.3.7 – "the Owner shall waive all rights in accordance with the terms of Section 11.3.7" – and section 11.3.7 does not apply to claims for damage to non-Work property.

We are unpersuaded by these arguments.  ACE misconstrues the basic structure of the two subrogation-waiver provisions.  Section 11.3.7 applies the waiver to any insured damage, whether occurring during or after construction, whether to the Work, to the Project, or to other insured property – so long as the policy covering the damage falls within one of the two categories identified: "property insurance obtained pursuant to this Section 11.3" or "other property insurance applicable to the Work."  Augmenting section 11.3.7, section 11.3.5 extends the waiver even to damage insured by a discrete policy.  Thus, the waiver applies "[i]f during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies <u>separate from</u> those insuring the Project."

---

[9]  In light of the analysis that follows, we need not decide whether a policy extension qualifies as "other than" a prior policy.  However, a strong argument can be made that a policy extension that covers a different time period, includes different coverage limits, and presumably has a different premium, is "other than" its predecessor-policy, even if its terms were otherwise unchanged.

(Emphasis added).  The waiver also applies "if after final payment, property insurance is to be provided on the completed Project through a policy or policies <u>other than</u> those insuring the Project during the construction period." (Emphasis added).

ACE's blanket all-risk policy fell within both categories of coverage subject to section 11.3.7.  Its builder's risk coverage constituted "property insurance obtained pursuant to this section 11.3" because it met the builder's risk insurance requirement.  See <u>Bd. of Comm'rs v. Teton Corp.</u>, 30 N.E.3d 711, 716 (Ind. 2015) (holding, with respect to identical provisions of A201-1987, that pre-existing all-risk property insurance policy "that covers both the entire existing property and the work" constitutes "property insurance obtained pursuant to this Paragraph 11.3"); <u>Haemonetics Corp. v. Brophy & Phillips Co.</u>, 501 N.E.2d 524, 526 (Mass. App. Ct. 1986) (stating that "[t]he preexisting insurance policy the owner had . . . was the insurance the owner chose to provide to comply with § 11.3 even though that policy may have been more extensive than what was required").  Moreover, inasmuch as the ACE policy exceeded the coverage required by section 11.3.1, it was also "<u>other</u> property insurance applicable to the Work."  See <u>Lloyd's Underwriters v. Craig & Rush, Inc.</u>, 32 Cal. Rptr. 2d 144, 146 & n.4 (Ct. App. 1994) (stating that an existing all-risk property insurance qualified as "insurance applicable to the Work");

13

Emp'rs Mut. Cas. Co. v. A.C.C.T., Inc., 580 N.W.2d 490, 493 (Minn. 1998) (stating that "[t]he owner has the option of purchasing an all-risk policy specifically to cover the 'work' or can rely on any existing property insurance which would cover the 'work'").

Since the all-risk coverage both satisfied A201's insurance requirement and was "applicable to the Work," section 11.3.7 waived all claims for damages "to the extent covered" by the policy. As the Indiana Supreme Court persuasively observed in reviewing the identical language from A201-1987, "The positioning and plain meaning of the word "covered" restricts the scope of the subrogation waiver based on the source and extent of the property insurance <u>coverage</u>, not the nature of the <u>damages</u> or the <u>damaged property</u>." <u>Bd. of Comm'rs</u>, 30 N.E.3d at 716. Therefore, if one of the two identified policies provides coverage for the loss, then subrogation is waived, even if the policy provides broader coverage than required. <u>See also</u> <u>Emp'rs Mut. Cas. Co.</u>, 580 N.W.2d at 493 (stating, "[I]f the owner relies on an existing policy which is so broad that it covers both 'work' and 'nonwork' property, it waives the right to sue for all damages done as long as that damage is covered by the policy."). Thus, even where the damages are almost entirely non-Work-related, as they were here, the subrogation waiver applies, because the policy also covered the Work-related damages.

Reading sections 11.3.5 and 11.3.7 together supports our interpretation. Section 11.3.5 extends the subrogation waiver to damage covered by a policy "separate from those insuring the Project" that covers "properties, real or personal or both, at or adjacent to the site." It would be absurd to extend the waiver to damage to non-Project property only if the policy covering it were completely "separate from" the policy that the owner is required to obtain. As the Nebraska Supreme Court observed, considering the identical provisions of A201-1997, "We see no reason why the parties would intend a different result when, instead of purchasing two separate policies, the owner relied on one policy covering both the Work and the non-Work property." Lexington Ins. Co. v. Entrex Commc'n Servs., Inc., 749 N.W.2d 124, 135 (Neb. 2008). Rather, section 11.3.5 "shows that the contracting parties were not opposed to waiving damages to non-Work property." Ibid. In other words, section 11.3.5 is designed to extend the waiver related to non-Work property even when covered by separate policies. Cabining these sections as ACE proposes would leave a dead zone where the waiver, inexplicably, would not apply – where damage occurred to non-Work property covered not by a "separate" policy but by the same policy that covered the Work.

Our interpretation is also consistent with the majority view of other courts that have rejected the argument, pressed here by ACE, that the section

15

11.3.7 subrogation waiver is limited to damage to the Work. See, e.g., Lloyd's Underwriters, 32 Cal. Rptr. 2d at 148 (stating that "[t]he waived claims are not defined by what property is harmed (i.e. 'any injury to the Work'); instead, the scope of waived claims is delimited by the source of any insurance proceeds paying for the loss (i.e. whether the loss was paid by a policy 'applicable to the Work'")); Bd. of Comm'rs, 30 N.E.3d at 712-13 (adopting, along with "the majority of jurisdictions," the "'any insurance' approach," under which the Owner waives subrogation "based on the extent and source of the coverage, not the nature of the property damaged") (citing cases); Emp'rs Mut. Cas., 580 N.W.2d at 493 (stating its interpretation followed "the majority of jurisdictions" and citing cases); Lexington Ins. Co., 749 N.W.2d at 133-35 & n.30 (adopting the "majority interpretation" applying the waiver "to all damages – including Work and non-Work damages," and citing cases); Westfield Ins. Grp. v. Affinia Dev., LLC, 982 N.E.2d 132, 140, 144 (Ohio Ct. App. 2012) (adopting the "majority approach" that A201 "define[s] the waived claims by the source of the insurance proceeds, not by the property damaged," whether "Work or non-Work property," and citing cases).

ACE's attempt to place a temporal limit on the waiver fails, as well. By its terms, the subrogation waiver under section 11.3.7 also continues after completion of construction if the policy that satisfied section 11.3.7 remains in

16

force. The plain language of section 11.3.7 includes no temporal limitation. Thus, ACE's argument that the section 11.3.7 waiver is limited to damages incurred while construction was underway lacks textual support.

Nor does section 11.3.7 imply a temporal limitation. Where an owner chooses to continue a policy that both satisfied and exceeded the coverage required by section 11.3, the subrogation waiver continues, too. In Town of Silverton v. Phoenix Heat Source Sys., 948 P.2d 9, 13 (Colo. Ct. App. 1997), the town maintained insurance during and after installation of a new roof on the town hall. A post-completion fire triggered a claim against a subcontractor. Id. at 10. The court held that to the extent the town's insurance exceeded what section 11.3.1 required – meaning that it constituted "other property insurance applicable to the Work" – the subrogation waiver subsisted as long as the insurance remained in force. Id. at 13. "[T]he fact that a contractor had finished its work and had no remaining insurable interest in the property did not terminate the waiver of subrogation rights." Ibid. "Because property insurance applicable to the work, other than that obtained pursuant to paragraph 11.3.1, may remain in effect after the final completion date, so too may a waiver of subrogation rights under paragraph 11.3.7 remain in effect."

<u>Ibid.</u>[10]   The court noted that the "Work" that an owner insures means "the construction and services required by the Contract Documents, <u>whether completed or partially completed</u>."  <u>Ibid.</u> (citing A201-1987 § 1.1.3) (emphasis added).

That section 11.3.7 waives subrogation for post-completion damages is also evident from its relationship with section 11.3.5.  Section 11.3.5 extends the waiver to separate policies an owner may procure post-completion to insure the Project.  <u>See</u> A201 § 11.3.5 (waiving subrogation where "after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period."); <u>see also, e.g.</u>, <u>Colonial Props. Realty Ltd. P'ship v. Lowder Constr. Co.</u>, 567 S.E.2d 389, 391-92 (Ga. Ct. App. 2002) (applying the subrogation waiver where the owner obtained "a separate policy covering the completed project after final payment was made"); <u>Middleoak Ins. v. Tri-State Sprinkler Corp.</u>, 931 N.E.2d 470, 471 n.2, 472 (Mass. App. Ct. 2010) (holding, where the owner procured insurance policy two years after construction was complete, "the contractual provision for waiver of subrogation applies to

_____

[10]   We recognize that the Colorado court adopted the minority view as to whether the subrogation waiver extends to damages to non-Work.  <u>Town of Silverton</u>, 948 P.2d at 12; <u>see also</u> <u>Copper Mountain, Inc. v. Indus. Sys., Inc.</u>, 208 P.3d 692, 697 (Colo. 2009) (approving <u>Silverton</u> approach to non-Work damages).  As to that aspect of the court's decision, we respectfully disagree.

postconstruction losses as well as to losses during construction"); TX. CC., Inc. v. Wilson/Barnes Gen. Contractors, Inc., 233 S.W.3d 562, 571 (Tex. Ct. App. 2007) (stating that "as long as property insurance covered the damages to the structure, whether completed or not, the waiver applies").

If the section 11.3.7 waiver did not apply to post-completion damages insured by the same policy insuring the Project, yet extended under section 11.3.5 to such damages when covered by discrete policies, the waiver provisions would leave a temporal gap as implausible as the spatial gap we noted above. The evident purpose of section 11.3.5 is to preserve the subrogation waiver for post-completion damages, even if the owner happens to shift policies or insurers after construction is complete.

Reading section 11.3.7 as waiving subrogation for non-Work damage is also consistent with the waiver's general purpose, to avoid post-insurance-claim litigation. As the AIA's commentary to section 11.3.7 explains: "The purpose of the required property insurance is to transfer the risk of insured losses from the owner and contractor to the insurance company. It would defeat this purpose if the insurance company were allowed to sue either party to recover such losses." AIA Commentary to A201, at 46. See also Bd. of Comm'rs, 30 N.E.3d at 714 (stating that A201's waiver and insurance provisions are designed to "ensure that the parties resolve damages disputes

through insurance claims, not lawsuits"); cf. Sch. Alliance Ins. Fund, 353 N.J. Super. at 140 (stating generally that "[t]he purpose behind a mutual waiver of subrogation is to assure that, to the extent any loss is covered by a policy, the insurer should bear the risk of loss, regardless of any fault on the part of one or both of the parties"). Our interpretation, as the court in Haemonetics pointed out, "has the potential for avoiding litigation not only over liability issues related to the . . . cause of damage to the owner's property, but also over the issue whether the claimed loss is to the 'Work' or not." 501 N.E.2d at 526.

The commentary to section 11.3.5 also rejects the spatial and temporal gaps ACE advocates. The commentary states, "[Section 11.3.5] extends the provisions for waiver of subrogation to other property insurance the owner may purchase. Such policies may cover property at or adjacent to the project, or they may replace the property insurance that was in effect on the work during construction." Ibid. (emphasis added). Describing section 11.3.5 as an extension implies that its purpose is to fill the gaps left by section 11.3.7 by continuing the waiver for any property and for any period that the owner's required or Work-related insurance may not cover but that it nonetheless insures through a separate policy. Together, the two provisions ensure a seamless waiver that shields the contracting parties from suit by subrogees.

A-5395-16T4

We reject ACE's argument that applying the subrogation waiver here is inconsistent with the contractor's obligation to obtain liability insurance. ACE contends the liability insurance requirement would be unnecessary if the subrogation waiver shields the contractor from suit by the owner's insurer. We are unpersuaded. The contract expressly recognizes that the subrogation waiver takes precedence over the contractor's insurance obligation. Section 11.3.7 states that the "waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise . . . ." Accord Lexington Ins., 749 N.W.2d at 136 (noting the identical provision in A201-1997 in rejecting a similar argument); Chadwick v. CSI, Ltd., 629 A.2d 820, 826 (N.H. 1993) (noting that this language in Section 11.3.7 "reconciles any inconsistency" between the contractor's duty to indemnify and the subrogation waiver).[11]

The contractor's liability insurance serves an important purpose by providing an additional layer of coverage for damage that the owner's property insurance may not reach. For example, if the owner's losses exceed its policy limit, the

---

[11] Section 10.2.5 requires the Contractor to "promptly remedy damage and loss . . . to property referred to in Sections 10.2.1.2 and 10.2.1.3" – including "the Work and materials and equipment" and "other property at the time or adjacent thereto" – that the contractor or subcontractor causes "in whole or in part." However, the same section carves out "damage or loss insured under property insurance required by the Contract Documents." A201 § 10.2.5.

contractor's liability insurance could cover at least part of the balance. The liability insurance would also provide a source of compensation to injured third parties, who might otherwise seek remedies from the owner.

In sum, notwithstanding that most of the damage affected non-Work property and occurred after construction was completed, the subrogation waiver bars ACE's action against American, since its blanket all-risk insurance satisfied A201's requirements and covered the Work.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                    A-5395-16T4