**ASIC II LIMITED, Plaintiff,**

v.

**STONHARD, INC., Defendant.**

**No. Civ. 97–204–P–C.**

United States District Court,
D. Maine.

Sept. 6, 1999.

Richard L. O'Meara, Murray, Plumb & Murray, Portland, Maine, for plaintiff.

Peter J. DeTroy, III, Russell Pierce, Norman, Hanson & DeTroy, Portland, Maine, for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff ASIC II Limited ("ASIC II") and Defendant Stonhard, Inc. ("Stonhard") have submitted this case to the Court for decision on a Stipulated Record ("SR").[1] *See* Docket No. 49. National Semiconductor Corporation ("NSC") is a manufacturer of "semiconductor wafers" which owns and operates a manufacturing facility located at 333 Warren Avenue in South Portland, Maine. SR ¶ 2. In May of 1993, NSC entered into a Construction Management Contract with CMPA, Inc., ("CMPA") to have it serve as the construction manager for the building of NSC's three-story addition to its manufacturing facility in South Portland.[2] SR ¶¶ 9–10; Ex. 36. This new addition will be referred to as "Building 17." SR ¶ 8. NSC later entered into a contract with Stonhard pursuant to which

---

1. The parties have stipulated to the truth of the facts for the purposes of this action only. The parties reserve the right to contest, in their respective arguments submitted to the Court, the weight or relevance of any of the above facts or the facts contained in the Affidavit of Michael Bisson. SR ¶ 30.

2. CMPA is a Texas corporation with its principal place of business in Grapevine, Texas. SR ¶ 9.

Stonhard agreed to furnish and install a chemical-resistant floor coating system in Building 17, then under construction. SR ¶ 11.

On the morning of February 5, 1994, a fire occurred on the construction site of Building 17 in the location of a temporary platform where Stonhard had placed boxes of chemical sealant materials. SR ¶ 18. The fire caused damage to the Building 17 construction project, predominantly in the form of heavy smoke damage. SR ¶ 19. The fire and smoke damage to Building 17 in the amount of $500,911 proximately resulted from Stonhard's conduct in handling and storing its floor coating chemicals, which conduct constitutes negligence and breach of contract as alleged in Counts I and II of Plaintiff's Complaint.[3] SR ¶ 1.

For the period from April 1, 1992, through April 1, 1995, Industrial Risk Insurers ("IRI") was NSC's direct casualty insurer under Policy No. 31-3-57327, captioned "Worldwide Property Insurance Policy."[4] SR ¶ 3; Exhibit 76. ASIC II is the successor corporation to ASIC Limited Reinsurance Corporation, which was the reinsurer of the risks described in the IRI policy covering the NSC location in issue.[5] SR ¶ 5. The damages of $500,911 were covered by the IRI policy, subject to a $100,000 deductible which was the responsibility of NSC. SR ¶ 23; Ex. 76. For the

purposes of this action, ASIC II stands in the shoes of NSC, with respect to NSC's rights to initiate legal action against the party or parties responsible for the loss.[6] SR ¶ 7.

Because Stonhard has admitted liability on Count I for negligence and Count II for breach of contract, the only issue before the Court for decision is the applicability of Stonhard's affirmative defense that the action is barred by the doctrine of waiver of subrogation. See Amended Answer (Docket No. 36). The Court concludes that the waiver provision in the General Conditions of the contract between Stonhard and NSC is applicable and bars this action.

## I. FACTS

From the stipulated record, the events which led up to the formation of a contract to supply and install a floor coating in Building 17 are as follows. On November 23, 1993, CMPA, sent Michael Bisson, project engineer at Stonhard, a document entitled "Invitation to Bid" for the installation of floor coating. Affidavit of Michael Bisson (Docket No. 50) at ¶ 3. The Invitation to Bid included the designation "Bid Package No. 707-1.11-09705-Floor Coating" ("bid package") and included the following materials: a cover letter dated

3. The damage figure of $500,911 consists overwhelmingly of charges for labor and materials of various contractors who participated in cleaning up the smoke damage throughout Building 17 following the fire. SR ¶ 19. The damage figure does not include any amounts paid to Stonhard for any damage which may have resulted to its partially completed work in coating the ground floor of Building 17 or for destruction of any of Stonhard's materials or equipment in the fire. SR ¶ 19.

4. Stonhard was not a named additional insured expressly or by reference on the IRI policy. SR ¶ 4.

5. Plaintiff ASIC II is a Hawaii corporation with its principal place of business in Honolulu, Hawaii, SR ¶ 6; is a wholly-owned subsidiary of NSC, SR ¶ 6; and is a licensed insurance company in the State of Hawaii, authorized under Hawaii statute as a "captive" insurance company to reinsure the risks of its parent company, SR ¶ 6.

6. Exhibit 80 is a true and correct copy of the Sworn Proof of Loss Statement, dated September 30, 1994, which NSC submitted to IRI. SR ¶ 24. Exhibit 81 is a true and correct copy of the Subrogation Receipt, dated September 30, 1994, which NSC provided to IRI. SR ¶ 25. Exhibit 82 is a true and correct copy of the Loan Receipt between IRI and NSC, dated September 30, 1994. SR ¶ 26. Exhibit 85 is a true and correct copy of a Subrogation Receipt/Assignment between NSC and ASIC Limited Reinsurance Corporation, dated June 9, 1997. SR ¶ 27. Exhibit 85 assigned to Plaintiff any right that NSC may have had to recover the $100,000 deductible under the IRI policy. SR ¶ 27.

November 23, 1993, from John Burrus at CMPA to Michael Bisson at Stonhard, a "Proposal Form," a "Lump Sum Contract—Short Form," 20 pages of "Job Procedures," and 29 pages of "General Conditions." Ex. 1. In the section entitled General Conditions, ¶ 6.5(B) provides for waiver between the owner and the contractor for damages caused by fire. Ex. 1, General Conditions ¶ 6.5(B). Mr. Bisson discussed the bid package with several people at Stonhard in the course of preparing to bid on the job. Bisson Aff. ¶ 4. Mr. Bisson specifically discussed with Don Sampson, a District Manager at Stonhard, some of the General Conditions of the bid proposal, including section 6.7, referencing the contractor's obligation to insure against "fire and other risks included in its standard extended coverage endorsement." Bisson Aff. ¶ 4. Mr. Bisson asserts that Stonhard does not provide such coverage and, accordingly, in its proposal Stonhard did not include property insurance as part of the bid. Bisson Aff. ¶ 4.

On December 3, 1993, Mr. Bisson delivered to Bobby Adams, Project Manager at CMPA, a letter proposal with Stonhard's product recommendation dated December 2 and NSC's bid package Proposal Form signed and dated December 3. Bisson Aff. at ¶ 5; Exs. 3 and 4. Included in Stonhard's letter proposal were provisions delineating the scope of work, a price quotation of $79,850, a warranty, the contractual terms and conditions it was proposing, and a customer satisfaction commitment. Ex. 3. The terms and conditions section states, in part, "[t]he enclosed General Terms and Conditions are a part of this proposal and shall apply to a resulting purchase order or contract." Ex. 3 at 2. The next page attached to the letter proposal laid out the "General Terms and Conditions" providing that "[u]pon request by the Customer, Stonhard will furnish certificates of Workman's Compensation Insurance and Liabil-

ity Insurance." Ex. 3, General Terms and Conditions ¶ 1c. The General Terms and Conditions from Stonhard's letter proposal do not include a provision waiving rights to recover for damage due to fire and it affirmatively provides that "[t]his Agreement shall constitute the entire Agreement between the parties and the parties acknowledge that there are no other verbal or written Agreements, understandings or customs affecting the Agreement." Ex. 3, General Terms and Conditions ¶ 7.

The bid "Proposal Form" submitted by Stonhard included only some of the pages from the original bid package Proposal Form sent to Stonhard from CMPA. Compare Exs. 1 and 4. Notably missing are portions of the bid package "Proposal Form" including the promise on page 7 to provide certificates of insurance for all the coverages required by the proposed General Conditions.[7] Compare Exs. 1 and 4. Stonhard filled out the Proposal Form with the total contract price being $79,850, the same price quote Stonhard submitted in its letter proposal. The Proposal Form, however, included a provision that Stonhard "proposes to ... [t]he General Conditions ... will become part of the Contract Agreement with NSC Corporation." Ex. 4. The "Proposal Form" was signed by Mr. Bisson as representative of Stonhard. Ex. 4. Many of the terms of the General Conditions from NSC's bid package "Proposal Form" are at variance with the General Terms and Conditions found in Stonhard's letter proposal.

On or about December 7, 1993, Mr. Bisson met with Ken Baker of NSC, Bobby Adams, Project Manager at CMPA, and Eric Breiner, Product Engineer at Stonhard, at CMPA's office to discuss the floor coating aspect of the project. Bisson Aff. ¶ 6. Messrs. Baker and Adams wanted to run a "test patch" of the floor coating so that they could observe the qualities of

7. Also missing when Stonhard returned the proposal form was page 2, which incorporates within the scope of the work to be performed the specifications from the bid package, page 4 describing an exclusion to the scope of work, and page 8 delineating the schedule of when the work was to be completed. Compare Exs. 1 and 4.

Stonhard's products. Bisson Aff. ¶ 6. At that time Stonhard suggested that NSC also use an intermediate coat, known as a "mortar coat." Bisson Aff. ¶ 6. Stonhard indicated that use of the mortar coat would be a step-up in the specifications of the contract and there would be a corresponding increase in cost. Bisson Aff. ¶ 6. On or about December 10, 1993, NSC agreed to that step-up and, hence, the eventual contract price of $113,250, rather than the $79,850 reflected in the proposals submitted by Stonhard. Bisson Aff. ¶ 6.

On December 14, 1993, and January 24, 1994, Stonhard submitted the "Certificates of Insurance" for General Liability Insurance to NSC.[8] SR ¶ 21; Bisson Aff. ¶ 7; Ex. 79. At no time was Stonhard advised that the insurance certificates that Stonhard provided were not in compliance with Stonhard's contract with NSC. SR ¶ 21; Bisson Aff. ¶ 7. Also Stonhard was never advised by NSC that NSC had in place or intended to procure property insurance under the Stonhard/NSC contract, or that NSC was waiving any insurance procurement obligations. SR ¶ 21.

On January 4, 1994, CMPA sent Stonhard two copies of a document entitled "Lump Sum Contract—Short Form" from the bid package for execution. Bisson Aff. ¶ 8; Ex. 2A. The cover letter which accompanied the contracts provides "[a]fter careful review, would you please sign both copies and return them to CMPA ... CMPA in turn will obtain the appropriate signatures and return the fully executed copy to you for your file." Ex. 2A. The contract was not signed by Stonhard until February 8, 1994, three days after the fire on the project site.[9] The contract was never signed by NSC. Ex. 2. On January 6, 1994, NSC sent a purchase order for

installation of a chemical resistant floor coating in the amount of $113,250 to Stonhard referencing "the 12/3/93 proposal and quotes dated 12/16/93." [10] Ex. 5.

## II. DISCUSSION

Both parties now advocate a position which is opposite to that which their forms asserted during the negotiation of this contract. ASIC II asserts that the "history of contract formation and the exchange of documents in this case makes it clear that the parties intended for the job to proceed on the basis of Stonhard's proposed general [terms and] conditions, not the general conditions contained in the original bid package." Plaintiff's Closing Brief (Docket No. 53) at 5. As a result, it is asserted, Stonhard's waiver of subrogation defense must fail, entitling ASIC II to a judgment in its favor. Stonhard, to the contrary, now argues that the waiver clause included in NSC's General Conditions became part of the contractual agreement between Stonhard and NSC, thus entitling it to judgment on its affirmative defense.

Although the briefs submitted by the parties both rely on Maine law in presenting argumentation on the legal issues in this case, there is no explicit agreement or statement by the parties as to what substantive state law governs under the contract. The General Terms and Conditions from Stonhard's letter proposal provides that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of New Jersey." Ex. 3, General Terms and Conditions ¶ 6. Because the Court finds *infra* that the General Conditions from NSC's bid package became the conditions of the contract and they provide that contract to be governed

8. Both certificates are identical with regard to the general liability insurance coverage. However, the certificate sent in January also showed coverage in place for automobile and worker's compensation insurance. Ex. 79.

9. The Court draws no inferences from the fact that the contract was not signed by Stonhard

until after the fire occurred on February 5, 1994.

10. The record does not include the quotes of December 16, 1993, but the Court assumes, and the parties do not assert otherwise, that the quotes "dated 12/16/93" reflect the increase in contract price to $113,250.

by "the laws of the State in which the Work is to be preformed," the Court will apply Maine law in this case. Ex. 1, General Conditions at ¶ 6.12.

### A. Terms of the Contract

█ Both parties start from the standpoint that a contract was formed here and that there was a meeting of the minds on the issue of the waiver. Relying on the arguments of the parties regarding the documents which formed the contract, the Court was initially doubtful that there was sufficient evidence to find a meeting of the minds on any general conditions. After a comprehensive review of the documents presented in the stipulated record, the Court has determined that Stonhard and NSC did agree on general conditions to this contract.

During the negotiation phase of this contract formation, Stonhard made two offers—conflicting in terms on the issues of, *inter alia*, property insurance and waiver of subrogation. *See* Exs. 1 and 3. Ultimately, although the parties never joined in the execution of any one contract document,[11] there was an offer and acceptance forming a contract which included the General Conditions from NSC's bid package. Stonhard submitted two different offers—one proposing its own General Terms and Conditions and the other accepting the General Conditions in NSC's original bid package. *See* Exs. 3 and 4. NSC's subsequent purchase order, referencing Stonhard's December 3 offer, was acceptance of that offer, and thus a binding contract was formed. The December 3 Proposal Form provided that Stonhard "proposes to ... [t]he General Conditions ... will become part of the Contract Agreement with NSC Corporation." Ex. 4. Although the exact nature of the floor coating, and hence the total contract price were stepped up as a result of negotiations regarding the appropriate product to use after Stonhard submitted its proposals, the intent of the parties regarding the applicability of the General Conditions from the original bid package was clearly established: Stonhard bid to the General Conditions in the original bid package and NSC accepted that offer, thereby implicitly rejecting the divergent General Terms and Conditions included in Stonhard's letter proposal dated December 2, 1993. On this basis, the Court concludes that the parties reached a meeting of the minds that the General Conditions from NSC's bid package controlled the conduct of the parties.

### B. Application of the Waiver Provision

█ ASIC II argues that even if the Court finds that the general conditions from NSC's original bid package were included in the contract, Stonhard's waiver-of-subrogation defense would fail because of its prior breach of the very contract provision ¶ 6.5(B) regarding securing all-risk property insurance. It is Stonhard's failure to procure property insurance as required by ¶ 6.5(B) that is the basis on which ASIC II asserts that Stonhard committed a prior material breach of its contractual obligation and should not now be entitled to rely on another portion of the same subparagraph of the contract—the waiver provision based on the assumption that property insurance was procured by Stonhard—to escape liability. In spite of the fact that it did not procure property insurance or all-risk fire insurance, SR ¶ 28, Stonhard responds that it can rely on the waiver defense because the obligation to procure all-risk property insurance is expressly conditional. The property insurance provision in the General Conditions states: "*Unless otherwise provided*, Contractor shall obtain property insurance...." Ex. 1, General Condition ¶ 6.5(B). The provision regarding the procurement of property insurance also states that "Owner, at its election, may provide the insurance required by this Subparagraph B in lieu of the Contractor providing

---

11. The Lump Sum Contract—Short Form is not binding here because it was never signed by NSC or its agent, CMPA. Ex. 2.

the same...." Ex. 1, General Conditions ¶ 6.5(B). Stonhard argues that the property insurance was otherwise provided by NSC.

Here, neither of Stonhard's offers included the cost of property insurance. The bid package Proposal Form, provided by NSC, allotted a space for the contractor's bid to specifically indicate the separate cost of property insurance and that space was left blank by Stonhard when the offer was submitted. Thus, in reviewing bids for the floor coating and accepting one of Stonhard's proposals, NSC knew that Stonhard had not obtained all-risk property insurance on the project. Moreover, although the Property Insurance subparagraph of the General Conditions provides that "Contractor shall provide to Owner a Certificate of Insurance indicating that said insurance has been obtained and is in full force and effect as specified herein," Ex. 1, General Conditions ¶ 6.5(B), Stonhard never provided to NSC a Certificate of Insurance that indicated that such insurance on the project had been obtained. The only certificates of insurance submitted to NSC were Stonhard's commercial general liability insurance, automobile insurance, and worker's compensation insurance. SR ¶ 29; Ex. 79. Stonhard was never advised by NSC that the insurance certificates provided were not in compliance with the contract. Bisson Aff. at ¶ 7. The insurance that NSC had for the project under an existing all-risk insurance policy with IRI in fact insured the project for risk of loss by fire. SR ¶ 23. Given this fact, the Court finds that NSC knew that it had property insurance in place covering Building 17 and that it was assuming, "at its election," the right to provide property insurance.[12] Accordingly, Stonhard was not in breach of the contractual provision, but, rather, the property insurance was "otherwise provided" by NSC.[13]

Next, ASIC II argues that the waiver of subrogation defense does not apply because Stonhard cannot satisfy either prong of the waiver provision. The waiver clause provides, in pertinent part:

> Owner and Contractor waive all rights against each other and any of the subcontractors, sub-subcontractors, agents and employees for damages caused by

---

12. One of the stipulations entered into in this case is: "To the best of the knowledge of both parties, there was no other property or fire insurance policy in force at the time of the fire which provided coverage for the loss." SR ¶ 22. The Court understands "both parties" to mean ASIC II and Stonhard, the litigants herein. Thus, the stipulation does not foreclose NSC's knowledge of the existence of the IRI policy.

13. Stonhard also finds support for its position in the language of a contract executed in June of 1993 between NSC and CMPA. Ex. 36. Specifically, Stonhard relies on ¶ 8.6 of the Construction Management Contract for the construction of building 17 which allocates the responsibilities for obtaining property insurance between the project owner, NSC, and the construction manager, CMPA. That provision states:

> Owner shall insure, or at its election, self-insure for full insurable value, existing facilities of owner at or near the site of the Project and the work itself. Owner also agrees to insure or self-insure all transit

damage losses (in excess of carrier liability) to property of Owner and to property purchased by CM for the account of Owner and to property purchased for incorporation in the work. (The "Work" is defined to include, without limitation, all materials and supplies stored on the Project site for use or incorporation in the Project, all temporary construction on the site and any items of equipment owned or leased by Owner.) Such insurance shall provide coverage against all losses which might result from risks insurable by a combination of a fire and extended coverage policy, a boiler and machinery policy, a business interruption policy, an ocean (and air) transit policy and a broad form "All Risks" difference in conditions policy.

Ex. 36 ¶ 8.6. In reaching its conclusion, the Court has not given any weight to this argument. At best, this provision manifests an intent on the part of NSC in June of 1993 to insure the project. The provision, however, is binding only as between NSC and CMPA; it certainly does not bind the NSC to provide the insurance as between it and a third party like Stonhard.

fire or other perils to the extent covered [1] by property insurance obtained pursuant to this Subparagraph or [2] other property insurance applicable to the Work.

Ex. 1, General Conditions ¶ 6.5(B). The reference to the "Work" in ¶ 6.5(B) incorporates a term expressly defined in the General Conditions as:

> All material, labor, tools and all appliances, machinery, transportation and appurtenances necessary to perform and complete the Contract, and such additional items not specifically indicated or described which can be reasonably inferred, as belonging to the item described or indicated and as required by good practice to provide a complete and satisfactory system or structure.

Ex. 1, General Conditions ¶ 1.8. ASIC II argues that both prongs of the waiver clause require that the insurance procured must cover "the interest of the Owner, Contractor, subcontractors, and sub-subcontractors in the Work,...." Ex. 1 General Conditions pp. 22–23. The first prong of the waiver clause requires that the insurance be obtained pursuant to "this Subparagraph" which ASIC II asserts means that it is insurance which covers "the interest of the Owner, Contractor, subcontractors, and sub-subcontractors in the Work,...." ASIC II contends that the IRI policy issued on April 1, 1992, before the parties entered into a contract, does not meet the requirement that it be obtained pursuant to ¶ 6.5(B). The second prong explicitly indicates "property insurance applicable to the Work." Both prongs, ASIC II argues, focus on property insurance which provides coverage for the Work of the contractor and that, here, the IRI policy did not cover Stonhard's work.

■ ASIC II seeks to avoid the waiver clause by arguing that NSC agreed to insure only the Work and to waive rights only to the extent Stonhard's Work was insured. Stonhard disagrees with ASIC II's narrow construction of the word "Work," asserting that the waiver clause is coextensive with the property insurance actually procured.[14] If the property insurance actually procured covers more than just the location of a particular contractor's own work, the waiver of subrogation must still be effective as to all fire damages covered by insurance, not just fire damage to the "Work" itself. NSC chose not to obtain separate insurance (*i.e.,* "property insurance obtained pursuant to this Subparagraph") but instead, relied on its existing policy (*i.e.,* "other property insurance applicable to the Work"). The preexisting IRI insurance was the insurance that NSC chose to provide to comply with ¶ 6.5(B) even though that policy may have been more extensive than what was required. The waiver clause does not restrict the waiver of damages to "Work" but to the proceeds of any insurance provided under ¶ 6.5(B).

In *Willis Realty Assoc. v. Cimino Construction Co.,* 623 A.2d 1287 (Me.1993), the Law Court held that an identical contractual provision barred "subrogation recovery between the parties to the contract for damages to the extent covered by insurance." *Id.* at 1289. Indeed, a majority of courts that have interpreted the second prong of this type of provision have ruled that an existing policy of property insurance is broad enough to cover both "work" and "nonwork" property and the owner "waives the right to sue for all damages done as long as that damage is covered by the policy." *Employers Mutual Casualty Company v. A.C.C.T., Inc.,* 580 N.W.2d

---

14. Stonhard also asserts that if the waiver of subrogation clause is read restrictively, to apply only to fire damage to a particular contractor's work, it renders the last sentence of the subrogation clause meaningless, because it would never come into play. The last sentence of the waiver provision states: "A waiver of subrogation shall be effective as to a person or entity even though that person or entity did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged." Ex. 1, General Conditions ¶ 6.5(B).

490, 493 (Minn.1998); *see also Rahr Malting Co. v. Climatic Control Co., Inc.,* 150 F.3d 835 (8th Cir.1998); *Tokio Marine and Fire Ins. Co., Ltd. v. Employers Ins. of Wausau,* 786 F.2d 101 (2d Cir.1986); *American Ins. Co. v. L.H. Sowles Co.,* 628 F.2d 967, 968–69 (6th Cir.1980); *Richmond Steel, Inc. v. Legal & Gen. Assurance Soc'y, Ltd.,* 821 F.Supp. 793, 799–802 (D.P.R.1993); *Lloyd's Underwriters v. Craig and Rush, Inc.,* 26 Cal.App.4th 1194, 32 Cal.Rptr.2d 144, 146–48 (1994); *Chadwick v. CSI, Ltd.,* 137 N.H. 515, 629 A.2d 820, 826–27 (1993); *Haemonetics Corp. v. Brophy & Phillips Co., Inc.,* 23 Mass.App. Ct. 254, 501 N.E.2d 524, 525–26 (1986). *But see Fidelity & Guar. Ins. Co. v. Craig–Wilkinson, Inc.,* 948 F.Supp. 608 (S.D.Miss.1996); *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15 (Mo.1995); *Travelers Ins. Cos. v. Dickey,* 799 P.2d 625 (Okla.1990); *Public Employees Mut. Ins. Co. v. Sellen Constr. Co., Inc.,* 48 Wash. App. 792, 740 P.2d 913 (1987).

There is no compelling distinction between an insurance policy actually procured at the time of the contract, and an existing all-risk policy that meets the insurance procurement requirements of the contract in the first instance. Under Plaintiff's construction of the contractual language—that the scope of the waiver clause intended for the waiver to be limited to a discrete component of the work—it makes no sense for the contract to require "all-risk" property insurance. All-risk property insurance covers premises or property locations against fire or other perils. Thus, the only logical interpretation is that "other property insurance applicable to the Work" refers to insurance applicable to the location of the work or the building containing the work since that is the kind of insurance contemplated by ¶ 6.5(B) in the first instance. The Court finds that the waiver clause applies; NSC and Stonhard unequivocally waived "all rights against each other" for damages caused by fire to the extent covered by property insurance. The damages from the fire at Building 17 were covered by the IRI policy, hence, ASIC II's claims are barred.

### C. The $100,000 Deductible

■ ASIC II argues that even if the scope of the waiver clause immunizes Stonhard from liability for damage to NSC's nonwork property, Stonhard still remains liable to ASIC II for $100,000, representing the deductible incurred by NSC. Specifically, ASIC II points to a provision of ¶ 6.5(B) which states: "If the property insurance obtained under this Paragraph requires minimum deductibles, Contractor shall bear the risk of loss due to such deductibles." Ex. 1, General Conditions ¶ 6.5(B). The Court finds ASIC II's argument to be unpersuasive. ASIC II has made no claim against Stonhard for breach of contract seeking to recover under an alleged contractual obligation to repay NSC the $100,000 deductible. The breach of contract claim asserted in the Complaint is for Stonhard's failure to "conduct its work in a safe and prudent manner," Complaint ¶ 31, and ASIC II has not alleged as a separate cause of action any claim for recovery of the deductible. Moreover, ASIC II has never moved to amend its Complaint to add such a claim. Given ASIC II's failure to assert a claim for recovery of the deductible, the Court will not now consider it.

### III. CONCLUSION

Accordingly, the Court will enter judgment for Stonhard on its affirmative defense of waiver of subrogation and against ASIC II because its claims are barred by the contractual waiver provision.