

FILED
Jan 28 2014, 11:37 am
CLERK
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JONATHAN H. NUSBAUM**
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE,
Shambaugh & Son, L.P.:

**BRIAN P. CLIFFORD**
**MICHAEL L. JAMES**
Faegre Baker Daniels, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE,
Hamilton Hunter Builders, Inc.:

**JAMES J. SHEA**
**TIMOTHY W. DEGROOTE**
**ANDREW S. WILLIAMS**
Hunt Suedhoff Kalamaros, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ALLEN COUNTY PUBLIC LIBRARY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 02A04-1302-PL-78 |
| | ) | |
| SHAMBAUGH & SON, L.P., | ) | |
| HAMILTON HUNTER BUILDERS, INC., | ) | |
| W.A. SHEETS & SONS, INC., and, | ) | |
| MSKTD & ASSOCIATES, INC., | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Nancy Eshcoff Boyer, Judge
Cause No. 02D01-1002-PL-26

**January 28, 2014**

**OPINION ON REHEARING - FOR PUBLICATION**

**BARNES, Judge**

Shambaugh & Son, L.P., Hamilton Hunter Builders, Inc., W.A. Sheets & Sons, Inc., and MSKTD & Associates, Inc., (collectively "the Defendants") petition for rehearing following our decision in <u>Allen County Public Library v. Shambaugh & Son, L.P. et al.</u>, 997 N.E.2d 48 (Ind. Ct. App. 2013).[1] We grant rehearing to acknowledge and address some of the Defendants' rehearing arguments, but we reaffirm our original decision in all respects.

To summarize, this case concerns an effort by the Allen County Public Library ("the Library") to recoup from the Defendants the costs of cleaning up diesel fuel that leaked from underground pipes that were installed by the Defendants as part of a project to expand and renovate the main Library branch building. The Library collected $5,000 from Great American Insurance Group toward the cleanup costs under a "Builders Risk Plus" insurance policy the Library took out specifically for the renovation and addition project. App. p. 360. However, the Library alleges that the total cost of remediating the diesel fuel has already exceeded $490,000 and will continue to increase. The Defendants assert that the Library could only look to the $5,000 in pollution cleanup coverage from Great American to cover the remediation costs.

---

[1] Shambaugh and Hamilton Hunter have each filed separate rehearing petitions. W.A. Sheets and MSKTD have filed notices of joinder in Shambaugh's rehearing petition.

2

In our original opinion, we analyzed whether the Library had waived any right to seek payment from the Defendants under the following provision, Section 11.3.7, found in the standard American Institute of Architects ("AIA") construction contract entered into by the parties:

> Waivers of Subrogation. The Owner and Contractor waive all rights against each other and against the Construction Manager, Architect, Owner's other Contractors and own forces described in Article 6, if any, and the subcontractors, sub-subcontractors, consultants, agents and employees of any of them, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work, except such rights as the Owner and Contractor may have to the proceeds of such insurance held by the Owner as fiduciary . . . .

Id. at 317. Relying primarily upon Midwestern Indemnity Company v. Systems Builders, Inc., 801 N.E.2d 661 (Ind. Ct. App. 2004), trans. denied, we held:

> [T]he Library is not precluded by Section 11.3.7 of the standard AIA contract from seeking recovery for pollution cleanup costs for property contaminated by the Defendants' allegedly faulty construction that is outside the scope of "the Work" for which the Defendants were contracted to perform. Namely, the Defendants may be required to reimburse the Library for cleanup costs of the land outside of the library building itself.

Shambaugh, 997 N.E.2d at 55-56. We also stated, "To be clear, the Library is alleging the diesel fuel leak spread beyond the strict confines of the library construction project and seeped into the surrounding land, and that the Library has incurred and will continue to incur significant costs associated with remediating that seepage from the land." Id. at 53-54.

3

On rehearing, one of the contentions raised by the Defendants is that, in fact, only "Work" property was damaged by the diesel fuel leak and, in fact, no "non-Work" property was damaged or contaminated and, therefore, the wavier of subrogation provision of Section 11.3.7 of the contract applied to bar the Library's claims. This argument was not made in the Defendants' original briefs, even though one of the Library's main arguments was that the fuel leak did in fact damage "non-Work" property. See Appellant's Br. pp. 12-14. Indeed, the Defendants did not make this argument before the trial court, either. It is a cardinal rule of appellate procedure that a party cannot raise an argument for the first time in a rehearing petition. See, e.g., Clark County Drainage Bd. v. Isgrigg, 966 N.E.2d 678, 679-80 (Ind. Ct. App. 2012).

In any event, we did review the record citations provided by the Defendants with respect to the argument that no "non-Work" property was contaminated by the diesel fuel. Without going into great detail, given that the Defendants did not make this argument in their original briefs, it is our opinion that there is at a minimum an outstanding genuine issue of fact as to the scope of the diesel fuel contamination and whether it exceeded the boundaries of "the Work" the Defendants were contracted to perform. The scope of contamination is unclear in the present record, and as summary judgment movants it was the Defendants' burden to establish that no "non-Work" property was contaminated. See Haegert v. McMullan, 953 N.E.2d 1223, 1233 (Ind. Ct. App. 2011) (stating general rule that "a moving party bears the burden of proving the non-existence of a genuine issue of material fact"). The scope of contamination may be litigated on remand and, if it is determined that no "non-Work" property was contaminated, then the Library would not be

4

entitled to any recovery from the Defendants because the waiver of subrogation provision would apply.

The second argument made on rehearing that we address is that the Midwestern case upon which we relied represents a "minority view" interpretation of the AIA contract's waiver of subrogation provision and that we should instead adopt the "majority view" interpretation. Again, as with the "Work" versus "non-Work" issue, none of the Defendants made any argument in their original appellate briefs that Midwestern was incorrectly decided, despite the Library's heavy reliance upon the case in its brief. Instead, the Defendants attempted to argue that Midwestern was distinguishable from the present case or, in fact, was supportive of their position. That is the argument we considered and rejected in our original opinion. The Defendants now argue that we should abandon Midwestern—too little, too late, the issue is waived.

We conclude that, even if we were to follow the so-called "majority view" in this case, the Defendants still would be unsuccessful. To reiterate, Midwestern held that Section 11.3.7 of the AIA contract "is limited to the work performed under the contract" and, therefore, if a contractor causes damage to property other than "the Work" to be performed under the contract, the property owner (or its insurer through subrogation) may seek recovery from the contractor for that damage, regardless of whether the damage was covered by insurance. Midwestern, 801 N.E.2d at 672-73. By contrast, cases from other jurisdictions that the Defendants claim represent the "majority view" "make no distinction between damages to 'work' and 'non-work' property. Instead, they consider whether the insurance policy was broad enough to cover damages to work and non-work property and

5

whether the policy paid for the damages. If the answer to both questions is yes, the waiver applies." Federal Ins. Co. v. Woodruff Const., 2012 WL 5954588, *2 (Iowa Ct. App. 2012).[2]

In virtually every single one of the "majority view" cases cited by the Defendants, a property owner relied upon pre-existing property insurance to satisfy its obligation to procure insurance for a construction project under the AIA standard contract, which insurance covered both "non-Work" and "Work" property, a contractor caused damage to "non-Work" property, the property insurer paid the property owner for the loss, and the property insurer then sought subrogation from the contractor. See ASIC II Ltd. V. Stonhard, Inc., 63 F. Supp.2d 85 (D. Me. 1999); Lloyd's Underwriters v. Craig & Rush, Inc., 32 Cal. Rptr.2d 144 (Cal. Ct. App. 1994); Woodruff, 2012 WL 5954588; Haemonetics Corp. v. Brophy & Phillips Co., Inc., 501 N.E.2d 524 (Mass. Ct. App. 1986); Employers Mut. Cas. Co. v. A.C.C.T., Inc., 580 N.W.2d 490 (Minn. 1998); Lexington Ins. Co. v. Entrex Commc'n Servs., Inc., 749 N.W.2d 124 (Neb. 2008); Chadwick v. CSI, Ltd., 629 A.2d 820 (N.H. 1993); Westfield Ins. Group v. Affinia Dev., LLC, 982 N.E.2d 132 (Ohio Ct. App. 2012). The Lloyd's Underwriters case, for example, specifically observed that the property owner had chosen not to purchase a "builder's risk" policy with coverage limited to "the Work" and further stated, "We caution that there may have been a different result had Owner procured a specific policy, such as a 'builder's risk' policy the protection

---

[2] In Iowa, unlike in Indiana, unpublished decisions may be cited as authority so long as they are readily accessible electronically, though they are not controlling upon other Iowa courts. See Iowa Court R. 6.904(2)(c).

6

of which was limited to the Work itself, rather than having relied on appellants' 'all-risk' policy to cover the Work." Lloyd's Underwriters, 32 Cal. Rptr.2d at 146 n.4. The Minnesota Supreme Court also explained the distinction between "builder's risk" insurance and pre-existing property insurance when discussing the subrogation provisions of the AIA contract:

> The owner has the option of purchasing an all-risk policy specifically to cover the "work" or can rely on any existing property insurance which would cover the "work." However, the waiver clause creates the "work" and "nonwork" distinction based upon the owner's decision to purchase a new policy or to rely upon an existing one. The owner agrees to waive the right to sue for damages done only to the "work" if it purchases a separate all-risk policy specifically to cover the "work." But if the owner relies on an existing policy which is so broad that it covers both "work" and "nonwork" property, it waives the right to sue for all damages done as long as that damage is covered by the policy.

A.C.C.T., 580 N.W.2d at 493.

The Defendants also argue that in Mu Chapter of Sigma Pi Fraternity v. Northeast Construction Services, 273 A.D.2d 579, 582 n.2 (N.Y. A.D. 2000), app. denied, New York adopted the "majority view" interpretation of the AIA waiver of subrogation clause, contrary to the New York Court of Appeals' "minority view" holding in S.S.D.W. Co. v. Brisk Waterproofing Co., Inc., 556 N.E.2d 1097 (N.Y. 1990), which case we relied upon in Midwestern and our original opinion in the present case. Even if that were true, the precise holding the Defendants are referring to in Sigma Pi applied to bar a property insurer's subrogation action against a contractor for sums paid to the property owner for "non-Work" property loss. Much more relevant to the present case, the Sigma Pi court

also held that Section 11.3.7 of the AIA standard contract did <u>not</u> bar the property owner's separate action against the contractor to recover additional losses that were <u>not</u> covered by insurance or otherwise precluded by the AIA contract. <u>Sigma Pi</u>, 273 A.D.2d at 581.

Here, the Library specifically procured a "builder's risk" policy to cover only the renovation and addition project, i.e. "the Work." It did not rely upon a pre-existing general property insurance policy that applied to both "Work" and "non-Work" property, unlike the property owners in the "majority view" cases cited by the Defendants. There is no evidence in this case of any other insurance available to the Library that would cover pollution remediation costs of land outside "the Work" of the library building renovation and addition. As such, even under the holding of the "majority view" cases, most notably <u>Sigma Pi</u>, Section 11.3.7 of the AIA contract did not bar the Library from seeking to recover uninsured losses from the Defendants for damage caused to "non-Work" property by the Defendants.

With the above observations, we reaffirm our original opinion in all respects.

CRONE, J., and PYLE, J., concur.