**2015 UT App 10**

## THE UTAH COURT OF APPEALS

ROBERT HEMINGWAY AND DENISE HEMINGWAY,
Plaintiffs and Appellants,
*v.*
CONSTRUCTION BY DESIGN CORPORATION AND
CLAVELL T. ANDERSON,
Defendants and Appellees.

Opinion
No. 20130955-CA
Filed January 15, 2015

Fourth District Court, Provo Department
The Honorable Samuel D. McVey
No. 120401849

Thomas M. Regan and Leslie A. Hulburt, Attorneys
for Appellants

Terry M. Plant and Daniel E. Young,
Attorneys for Appellees

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1 Robert and Denise Hemingway appeal from the grant of summary judgment in favor of Clavell T. Anderson and his company, Construction By Design Corporation (collectively,

Anderson).[1] The Hemingways claim that the district court improperly interpreted a damages waiver in a construction contract to preclude them from recovering for damage caused by a fire in their home. Alternatively, they assert that summary judgment was improper because there was an unresolved dispute regarding whether the waiver even applied in this case. We agree with the Hemingways on the latter issue, and we therefore reverse the grant of summary judgment and remand for further proceedings.

BACKGROUND

¶2     In October 2010, the Hemingways hired Anderson to remodel the kitchen and sun room of their residence in Cedar Hills, Utah. Anderson and the Hemingways entered into a written agreement (the Agreement) that outlined the scope of the remodel work and the responsibilities and liabilities of each party. Article 2 of the Agreement defines "[t]he term 'Work' as used in the Contract Documents" to include "all labor necessary to complete the project of construction or remodeling . . . , and all materials and equipment to be incorporated therein." Article 12 of the Agreement sets out the Hemingways' responsibilities regarding property insurance. Article 12.1 requires the Hemingways to "purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall include the interests of the [Hemingways], [Anderson], and subcontractors in the Work[2]

---

1. In the district court there was some dispute about Construction By Design's relationship to the contract. That dispute is immaterial to the issue presented on appeal.

2. This Agreement actually says "the Word," but it is undisputed that this is a typographical error. We will use the Work, as that is the term the parties intended.

and shall insure against the perils of fire [and] extended coverage," among other things. Articles 12.2 and 12.3 describe certain logistical aspects of this requirement that are not at issue on appeal. Finally, Article 12.4 contains a waiver of liability: "The [Hemingways] and [Anderson] waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Article [12]."

¶3    On December 28, 2010, while construction was ongoing at the Hemingway residence, the kitchen or an area near the kitchen caught fire, resulting in significant damage to both the Work and the rest of the house (the Non-Work). The Hemingways submitted a claim to their insurance carrier, Liberty Mutual Insurance Company (Liberty Mutual), for all of the damage to the home. Liberty Mutual denied payment for damage to the Work on the basis that "[t]he policy of insurance with Liberty Mutual did not cover . . . any of the improvements and/or changes that were made by [Anderson]." However, the insurance company paid the Hemingways' claims for damage to the Non-Work in the amount of $532,370. Pursuant to a subrogation clause in the homeowners' insurance policy, Liberty Mutual then brought this suit, in the names of its insureds, to recover damages from Anderson.[3]

¶4    Anderson moved for summary judgment, asserting that the Article 12.4 waiver barred Liberty Mutual's subrogation claim. According to Anderson, it was reasonable to infer that because the Hemingways had not obtained any other insurance to fulfill their obligations under the Agreement, they intended the Liberty Mutual homeowners' policy (the preexisting homeowners' policy) to satisfy Article 12.1's condition that they obtain insurance to cover the Work. And because the preexisting

---

3. The Hemingways also sought to recover $200,804 for damage to the Work. They later voluntarily dismissed this cause of action, and it is not at issue on appeal.

homeowners' policy provided coverage for damage to the Non-Work, Anderson contended that Article 12.4's language relieving it of liability "for damages caused by fire . . . *to the extent covered by insurance provided*" should be broadly interpreted to preclude the Hemingways from seeking reimbursement for *any* claims that were within the homeowners' policy's scope of coverage, specifically the fire damage to the Non-Work. (Emphasis added.) In support of his position, Anderson referred the district court to cases from a number of jurisdictions that have adopted this approach, which the parties refer to as the "source of coverage" approach.

¶5     The Hemingways opposed summary judgment, arguing that the Article 12.4 waiver did not apply to the Non-Work damage for two reasons. First, they asserted that they did not procure an insurance policy of any kind to cover the Work as required by Article 12.1. Instead, the only policy they had that covered damage to the home was the preexisting homeowners' policy, and that policy covered only the Non-Work. They therefore contended that because Article 12.4 waived damages claims only "to the extent covered by insurance provided under [Article 12]," the waiver could not bar a subrogation claim under the preexisting homeowners' policy. The Hemingways supported this position with two declarations: one in which Mr. Hemingway asserted that he "did not purchase and/or maintain property insurance for [Anderson]'s work at [the Hemingway] home" and another in which a Liberty Mutual claims adjustor attested that "[t]he policy of insurance with Liberty Mutual did not cover, nor were the Hemingways paid[] for[,] any of the improvements and/or changes that were made by [Anderson]." Second, the Hemingways contended that the Article 12.4 waiver did not apply to the Non-Work damage, even if the preexisting homeowners' policy was the insurance contemplated by Article 12.1, because Article 12.4 waived claims only for damage to the Work itself, not all damage covered by whatever policy fulfilled their Article 12.1 insurance obligations. The Hemingways argued that the language of other portions of the Agreement supported this narrower reading of Article 12.4. In this regard, the

Hemingways urged the district court to apply the approach that has been adopted by a handful of courts in other jurisdictions—which the parties refer to as the "type of damages" approach—rather than the "source of coverage" approach advanced by Anderson.

¶6      Following a hearing, the district court granted Anderson's motion for summary judgment, explaining that the undisputed facts demonstrated that the Hemingways were "relying on their Liberty Mutual policy to comply with [the Article 12.1] provision" requiring that they obtain insurance to cover damage to the Work. Then, applying the "source of coverage" approach, the district court concluded that Article 12.4, which exempted Anderson from liability for fire damage "to the extent *covered by insurance provided* under [Article 12]," waived subrogation for damage to any property covered by the preexisting homeowners' policy. (Emphasis added.) In other words, having determined that the preexisting homeowners' policy was intended to satisfy the Hemingways' obligation to obtain insurance to cover the Work and that the Article 12.4 waiver applied to any damages covered by such insurance—which in this case included the Non-Work—the court concluded that the Hemingways were precluded from seeking recovery from Anderson for *any* of the damages caused by the fire, whether to the Work or the Non-Work portions of the home. In reaching its conclusion, the district court did not address whether the preexisting homeowners' policy actually included coverage for the Work itself. The Hemingways appeal.

ISSUE AND STANDARD OF REVIEW

¶7      The Hemingways argue that summary judgment was improperly granted in favor of Anderson. Summary judgment is appropriate "only when all the facts entitling the moving party to a judgment are clearly established or admitted" and those facts "preclude[], as a matter of law, the awarding of any relief to the losing party." *Smith v. Four Corners Mental Health Ctr., Inc.,*

2003 UT 23, ¶ 24, 70 P.3d 904 (alteration in original) (citations and internal quotation marks omitted). We review the grant of summary judgment for correctness, viewing the facts and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

ANALYSIS

¶8      Pursuant to a subrogation clause in the preexisting homeowners' policy, Liberty Mutual (through its insureds, the Hemingways) seeks to recover the amount of money it paid the Hemingways for damage to real and personal property in the Non-Work portion of their home. "Subrogation is a doctrine conceived in equity that allows a person or entity [that] pays the loss or satisfies the claim of another under a legally cognizable obligation or interest to step into the shoes of the other person and assert that person's rights." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 22, 52 P.3d 1179 (alteration in original) (citation and internal quotation marks omitted). In the case of a subrogation clause in an insurance agreement, "[t]he insurer succeeds to the insured's cause of action against a responsible third party." *Id.* Because the insurer is assuming, through subrogation, the claims that the insured could have asserted, "the insurer can be subrogated to only such rights as the insured possesses." *Id.* ¶ 23 (citation and internal quotation marks omitted). And "an insured can generally waive an insurer's subrogation rights against a particular third party through a pre-loss agreement." *Id.* This means that "the insurer is subject to any viable defenses the third party can assert against the insured, including a release from liability or a waiver of a cognizable cause of action." *Id.* (citations omitted).

¶9      Article 12.4 of the Agreement between the Hemingways and Anderson contains such a waiver. It reads, "The [Hemingways] and [Anderson] waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Article [12]." The

district court interpreted Article 12.4 to amount to a blanket waiver of all damages resulting from the fire that were paid by Liberty Mutual under the preexisting homeowners' policy. In reaching that conclusion, the district court applied the "source of coverage" approach argued for by Anderson and adopted by the majority of jurisdictions that have considered how to allocate the risk and responsibility for damage to Work and Non-Work property when a construction contract contains a waiver of liability similar to the one included in Article 12.4.[4] A minority of jurisdictions have adopted the alternative "type of damages" approach that the Hemingways urged the district court to use in determining the scope of the waiver provision in the Agreement.

---

4. All of the cases the parties have cited, as well as the cases that we have independently located on the subject, have involved an American Institute of Architects (AIA) standard form contract with a waiver that contains the following emphasized language: "The Owner and Contractor waive all rights against each other . . . for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this [Agreement] *or any other property insurance applicable to the Work*." (Emphasis added.) Although the Agreement in the instant case apparently is derived from the standard AIA contract, the Article 12.4 waiver does not contain the language "or any other property insurance applicable to the Work." That phrase seems to significantly strengthen the persuasive appeal of the "source of coverage" approach because it lends itself to a plain language analysis leading to a conclusion that the waiver is meant to be expansive. But we do not consider at this time the effect, if any, that the absence of that additional language in the Agreement might have on the scope of the waiver in this case because we have determined that reversal and remand are appropriate on another basis.

¶10     The primary difference between the two approaches relates to the distinction each draws between Work and Non-Work. Under the "source of coverage" approach, there is "no distinction between Work and Non-Work"; rather, "the scope of waived claims is delimited by the source of any insurance proceeds paying for the loss (i.e., whether the loss was paid by a policy applicable to the Work)." *Trinity Universal Ins. Co. v. Bill Cox Constr., Inc.*, 75 S.W.3d 6, 11–12 (Tex. App. 2001) (citation and internal quotation marks omitted). In other words, if the "owner's policy was broad enough to cover both Work and Non-Work property" and "the policy paid for damages," then the waiver provision applies to all damage—whether to Work or Non-Work—covered by the policy. *Id.* at 12. The rationale for this approach is that it "furthers the policy underlying the use of waiver of subrogation clauses in construction contracts," which is to "avoid[] disrupting the project and eliminate[] the need for lawsuits," by placing the risk of loss on the insurance company providing coverage. *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 135 (Neb. 2008); *see also Walker Eng'g, Inc. v. Bracebridge Corp.*, 102 S.W.3d 837, 841 (Tex. App. 2003).[5]

---

5. This approach represents the majority view. *See, e.g., ASIC II Ltd. v. Stonhard, Inc.*, 63 F. Supp. 2d 85, 92 (D. Me. 1999); *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 148 (Cal. Ct. App. 1994); *Stop & Shop Supermarket Co. v. ABCO Refrigeration Supply Corp.*, 842 A.2d 1194, 1200 (Conn. Super. Ct. 2003); *E.C. Long, Inc. v. Brennan's of Atlanta, Inc.*, 252 S.E.2d 642, 646 (Ga. Ct. App. 1979); *Federal Ins. Co. v. Woodruff Constr.*, No. 12-0821, 2012 WL 5954588, at *3 (Iowa Ct. App. Nov. 29, 2012); *Haemonetics Corp. v. Brophy & Phillips Co.*, 501 N.E.2d 524, 526 (Mass. App. Ct. 1986); *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn. 1998); *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 134 (Neb. 2008); *Chadwick v. CSI, Ltd.*, 629 A.2d 820, 827 (N.H. 1993); *Westfield Ins. Group v. Affinia Dev., LLC*, 982 N.E.2d 132, 144 (Ohio Ct. App. 2012); *Penn Ave. Place Assocs., LP v. Century Steel Erectors, Inc.*, 2002 PA Super 133, ¶ 15, 798 A.2d

(continued...)

¶11 The "type of damages" approach, on the other hand, "makes a distinction between Work (as that word is defined in the contract) and Non-Work property and limits the scope of [any contractual] waiver to damages to the Work." *Trinity Universal*, 75 S.W.3d at 11. In other words, the scope of the waiver is defined and limited by the scope of the obligation to purchase insurance, i.e., to cover the Work. The waiver "bars subrogation only for those damages covered by insurance which the owner has provided to meet the requirement of protecting the contractor's limited interest in the building—i.e., damages to the Work itself." *Id.* (citation and internal quotation marks omitted). The courts that have adopted the "type of damages" approach reason that this interpretation is truer to the plain language of the insurance contract.[6]

---

256; *Trinity Universal Ins. Co. v. Bill Cox Constr., Inc.*, 75 S.W.3d 6, 13 (Tex. App. 2001); *Behr v. Hook*, 787 A.2d 499, 506 (Vt. 2001).

6. This approach is favored by a minority of jurisdictions. *See, e.g., Fidelity & Guar. Ins. Co. v. Craig–Wilkinson, Inc.*, 948 F. Supp. 608, 611 (S.D. Miss. 196), *aff'd*, 101 F.3d 699 (5th Cir. 1996) (per curiam); *Copper Mountain, Inc. v. Industrial Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009) (en banc); *Allen County Pub. Library v. Shambaugh & Son, LP*, 2 N.E.3d 132, 133–35 (Ind. Ct. App. 2014) (noting, on rehearing, that it had adopted the "type of damages" approach in its original decision but observing that the result of the case would not have changed even if the court had adopted the "source of coverage" approach); *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 556 N.E.2d 1097, 1098 (N.Y. 1990) (interpreting the 1976 version of the standard AIA contract); *Public Emps. Mut. Ins. Co. v. Sellen Constr. Co.*, 740 P.2d 913, 916 (Wash. Ct. App. 1987). *But see Mu Chapter of Sigma Pi Fraternity v. Northeast Constr. Servs., Inc.*, 273 A.D.2d 579, 582 (N.Y. App. Div. 2000) (applying the "source of coverage" approach when interpreting a new version of the standard AIA contract).

¶12    In this case, application of the "source of coverage" approach would mean that the Hemingways waived the right to collect damages for Non-Work to the extent that the property was covered under the insurance policy contemplated in Article 12.1. Application of the "type of damages" approach, on the other hand, would limit the waiver's application to just damage to the Work, even if the policy's coverage was broader. The Hemingways argue, however, that we need not reach the question of which approach Utah ought to adopt, either in this case or more broadly, because application of either approach requires first that the insurance policy in question cover the Work itself. And, they contend, the preexisting homeowners' policy did not cover the Work and thus was not the insurance that Article 12.1 either contemplated or required; as a consequence, the Article 12.4 waiver does not apply. They concede, however, that the district court did not resolve this crucial coverage question.

¶13    We agree with the Hemingways' central argument; that is, if their preexisting homeowners' policy was not the insurance contemplated by Article 12.1 of the Agreement, their claims against Anderson are not barred by the Article 12.4 waiver. Article 12.1 of the Agreement requires the Hemingways to "purchase and maintain property insurance *upon the entire Work* at the site to the full insurable value thereof. This insurance shall include the interests of the [Hemingways], [Anderson], and subcontractors in the Work and shall insure against the perils of fire . . . ." (Emphasis added.) Then, Article 12.4 "waive[s] all rights" between the Hemingways and Anderson "for damages caused by fire . . . to the extent *covered by insurance provided* under this Article [12]." (Emphasis added.) Thus, Article 12.4, by its plain language, ties the scope of the waiver to the insurance required by Article 12.1. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 15, 210 P.3d 263 (explaining that courts must interpret a contract according to its plain language and should consider each contract provision in relation to the other provisions so as to give effect to all provisions and to ignore none). Moreover, there is no basis in the case law, even in

the jurisdictions that have adopted the more sweeping "source of coverage" approach, for extending the waiver provision to claims for damages covered by an insurance policy that does not cover damage to the Work itself. For example, in *Allen County Public Library v. Shambaugh & Son, LP*, 2 N.E.3d 132 (Ind. Ct. App. 2014), the Indiana Court of Appeals observed that "the majority view [cases] make no distinction between damages to work and Non-Work property." *Id.* at 134. "Instead, they consider *whether the insurance policy was broad enough to cover damages to work and Non-Work property* and whether the policy paid for the damages. If the answer to both questions is yes, the waiver applies" to preclude recovery for all damages covered by that policy. *Id.* (emphasis added) (citation and internal quotation marks omitted); *accord Trinity Universal*, 75 S.W.3d at 12 (explaining that courts using the "source of coverage" approach interpret the waiver as precluding recovery of all damages covered by a policy if "the owner's policy was broad enough *to cover both Work and Non-Work property* and . . . the policy paid for damages" (emphasis added)).[7] And in jurisdictions applying the "type of

---

7. Anderson asserts that in *Haemonetics Corp. v. Brophy & Phillips Co.*, 501 N.E.2d 524 (Mass. App. Ct. 1986), the owner provided an insurance policy that "did not cover the 'Work'" and the Massachusetts Appeals Court still interpreted the waiver to "include[] all damages that were covered by [that] insurance [policy]" because it was the policy "provided pursuant to the contract." But Anderson does not identify the portion of the case that supports his assertion, and the case does not seem to do so. In *Haemonetics*, the court accepted that the owner had intended its preexisting insurance policy to satisfy its obligation to purchase property insurance under the construction contract. *Id.* at 526. Applying the "source of coverage" approach, the court concluded that the waiver of damages provision extended to any damages paid under that insurance policy, even if the damage was to Non-Work property. *Id.* at 525–26. However, the court did not state that the insurance policy did not cover the Work

(continued...)

damages" approach, the waiver is necessarily limited to Work damage because that approach interprets the contractual waiver as being limited to the scope of the obligation to purchase insurance, i.e., to cover the Work. *Trinity Universal*, 75 S.W.3d at 11 (explaining that in "type of damages" cases, the waiver "bars subrogation only for those damages covered by insurance provided to meet the requirement of protecting the contractor's limited interest in the building—i.e., damages to the Work itself"). We therefore conclude that the insurance provided under Article 12.1 must at least cover the Work before *either* the majority or the minority approach comes into play.

¶14    As a corollary, we note that the scope of the waiver would be the same under either approach if the insurance actually procured in fulfillment of Article 12.1 covered just the Work—it would be limited to damage to the Work itself, even if the homeowner had other insurance with broader coverage. *See Allen County Pub. Library*, 2 N.E.3d at 135 (explaining that even the courts that have adopted the "source of coverage" approach recognize that if the property owner chooses to purchase a policy "with coverage limited to 'the Work,'" then the "'owner agrees to waive the right to sue for damages done only to the "work"'" (citing the "source of coverage" case *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 146 n.4 (Ct. App. 1994), and quoting the "source of coverage" case *Employers Mutual Casualty Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn. 1998))). Consequently, the Article 12.1 insurance must

---

itself. Rather, the court's statement that the "preexisting insurance policy the owner had . . . was the insurance the owner chose to provide to comply with [the construction contract] even though that policy *may have been more extensive* than what was required" supports a conclusion that the policy, in fact, covered the Work in addition to Non-Work property. *Id.* at 526 (emphasis added).

cover both the Work and at least some Non-Work property for it to matter which interpretative approach applies.

¶15    Thus, before we reach the question of which approach Utah should adopt, we must first answer the question of whether the Hemingways provided any insurance policy that covers "the interests of the [Hemingways], [Anderson], and subcontractors in the Work," as required by Article 12.1. The only policy in place at the time of the fire was the preexisting homeowners' policy, which undisputedly covers the Non-Work; whether it also covers the Work is a matter of dispute. The Hemingways contend that their Liberty Mutual policy is not the policy contemplated by Article 12.1. They support their contention with an affidavit from a Liberty Mutual claims adjustor, who attested that "[a]fter the policy was incepted [in 2007], there were no changes made to the policy to reflect any additions and/or changes made to the home." Consequently, "[t]he policy of insurance with Liberty Mutual did not cover, nor were the Hemingways paid[] for[,] any of the improvements and/or changes that were made by [Anderson]."[8] Anderson counters that the Agreement required the Hemingways to purchase an insurance policy and that because the Hemingways admittedly did not buy a separate policy, "[t]he only reasonable conclusion to be drawn is that the Hemingways provided their Liberty Mutual policy [in fulfillment of their obligations] under Article 12.1." In making his argument, however, Anderson dismisses the possibility that the Hemingways were simply in breach of the Agreement. And in this regard, the district court

---

8. Mr. Hemingway also submitted an affidavit in which he attested that he "did not purchase and/or maintain property insurance for [Anderson]'s work at [the Hemingway] home." Mr. Hemingway's subjective intent regarding the Liberty Mutual policy, however, does not resolve the issue of whether the Liberty Mutual policy actually provided the coverage contemplated by Article 12.1.

never addressed whether the preexisting homeowners' policy actually covered the Work. This dispute is material to the resolution of the case because, as we just discussed, the Article 12.4 waiver has effect only if there is an insurance policy that also covers the Work. For that reason, we reverse the grant of summary judgment and remand to the district court for further proceedings, with the first step being resolution of the question about the scope of coverage of the preexisting homeowners' policy. Depending on the outcome of the first inquiry, the district court might then need to determine the scope of the Article 12.4 waiver.

¶16 In deciding to remand, we have considered whether it would be appropriate for us either to resolve the question of whether the preexisting homeowners' policy covers the Work as a matter of law or to provide guidance to the district court on the question of whether Utah recognizes either the "source of coverage" or the "type of damages" approach. We conclude that it is not prudent to do so in this case, for reasons we address below.

¶17 Often, the interpretation of the terms of a contract, such as the preexisting homeowners' policy, presents a question of law that, as a general matter, may be as readily resolved by an appellate court as by the district court. *Cf. Stevensen v. Goodson*, 924 P.2d 339, 346 (Utah 1996) (noting that "appellate courts are in as good a position as trial courts to interpret [legal issues such as] court rulings"). In this case, however, we conclude that judicial economy and integrity are better served by remand so as to allow the district court to consider the issue in the first instance. *See Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶¶ 30–33, 332 P.3d 900 (citing judicial economy when remanding for the district court to consider the appellant's constitutional argument on eminent domain—a legal question—because the district court had not yet had the opportunity to analyze the issue with the input of the parties, the issue had not been fully briefed by the parties, and the issue was likely to require remand to resolve factual issues even after the supreme court resolved

the legal question). To decide the legal question now, we would need to call for supplemental briefing, as neither the original briefing in this court nor the summary judgment pleadings in the district court address in any detail the proper interpretation of the preexisting homeowners' policy. Rather, at both court levels, the parties seem to have provided little more than conclusory assertions about the contents of the policy and its interpretation. And if there is any ambiguity in the policy's terms, we would have to remand in any event for the district court to resolve the ambiguity. *See WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 ("When ambiguity exists, the intent of the parties becomes a question of fact." (citation and internal quotation marks omitted)). Resolution of the coverage of the preexisting homeowners' policy is integral to the resolution of the scope of the Article 12.4 waiver dispute because the waiver's scope becomes pertinent in this case only if the preexisting homeowners' policy provides coverage for the Work.

¶18     For this reason, we believe that the question of which approach Utah ought to adopt for defining the scope of a waiver of damages provision in a construction contract, and the resulting impact on any right of subrogation, is not yet ripe for resolution.

> A dispute is ripe when a conflict over the application of a legal provision has sharpened into *an actual or imminent clash of legal rights* and obligations between the parties thereto. An issue is not ripe for appeal if there exists no more than a difference of opinion regarding the *hypothetical application of a provision* to a situation . . . .

*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 40, 238 P.3d 1054 (citation and internal quotation marks omitted). "The ripeness doctrine serves to prevent courts from issuing advisory opinions on issues that are not ripe for adjudication." *Id.* (citation and internal quotation

marks omitted); *see also Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 33, 104 P.3d 1185 (explaining that appellate courts are "disinclined to issue advisory opinions" where such opinions may "lack[] . . . any meaningful effect to the parties" (omission in original) (citation and internal quotation marks omitted)). Here, the issue before us is one of first impression in Utah with potentially far-reaching implications. Yet, because of the possibility that the preexisting homeowners' policy may provide no coverage for the Work, thus rendering the Article 12.4 waiver inapplicable, our resolution of which approach Utah ought to adopt in interpreting waivers of damages in construction contracts could amount to a purely advisory opinion. *See Lindberg*, 2010 UT 51, ¶ 40 (explaining that the purpose of waiting for a dispute to become ripe is to avoid issuing advisory opinions on issues that may never require judicial resolution).

¶19    Thus, we believe it is appropriate to allow the district court, with the input of the parties, to determine first whether the waiver provision is even applicable and, only if so, to determine its scope. Although the district court need not reconsider its analysis or application of the majority "source of coverage" rule should it determine that the preexisting homeowners' policy does provide coverage, it is, of course, free to do so on remand. And if the preexisting homeowners' policy provides only partial coverage, the district court, with the input of the parties, will need to consider how that might affect the scope of the waiver.[9]

¶20    We therefore remand for the district court to determine whether the preexisting homeowners' policy covers damage to

---

9. The possibility that the preexisting homeowners' policy provides only partial coverage came up at oral argument on appeal but was not addressed in the briefing. Accordingly, we leave it to the district court to determine the implications of partial coverage if this turns out to be the case.

the Work or any part of it and, if necessary, the scope of the Article 12.4 waiver provision.

CONCLUSION

¶21    We reverse the grant of summary judgment and remand the case to the district court for resolution of whether the preexisting homeowners' policy issued by Liberty Mutual is the insurance the Hemingways agreed to procure in Article 12.1 of the Agreement. If the preexisting homeowners' policy is the insurance contemplated by Article 12.1, then the district court should determine the scope of the Article 12.4 waiver.

—————